[Civ. No. 26118. Fourth Dist., Div. One. Oct. 21, 1983.]

DONALD R. McLAUGHLIN et al., Plaintiffs and Appellants, v. SIKORSKY AIRCRAFT et al., Defendants and Respondents.

Counsel

McInnis, Fitzgerald, Rees, Sharkey & McIntyre, James R. Milliken and James E. Chodzko for Plaintiffs and Appellants.

Gray, Cary, Ames & Frye, Rudi M. Brewster and Stephen Landuyt for Defendants and Respondents.

---

Opinion

**LEWIS, J.**[*]—Plaintiffs Donald R. McLaughlin and David Claude Hieter appeal a judgment after a jury returned a special verdict in favor of Sikorsky Aircraft in this products liability case for personal injury damages. The case was tried exclusively on a theory of strict liability due to alleged defective design. First and primarily, plaintiffs alleged defective design of the flight control system because the 1963 Sikorsky-made HH-3A combat and rescue helicopter which crashed in 1976 did not have redundant self-locking fasteners in the flight control linkage system. Second, as to Hieter alone, a design defect was alleged in that the copilot's seat of the helicopter was not crashworthy because it could not withstand sufficient G-forces in a crash. With Navy personnel McLaughlin in the rear of the helicopter and Hieter in the copilot's seat, the flight control linkage which controls the fore and aft pitch axis of the helicopter disconnected during flight. The linkage connections by design were a bolt, castellated nut and cotter pin which is a safe, serviceable and reliable linkage system with the three components in place. However, Navy maintenance personnel had not replaced the cotter pin during servicing so that the nut could vibrate loose permitting the bolt to come out of the linkage.[1] Thus, occurred the crash which seriously injured McLaughlin and Hieter.

We conclude it was error not to permit Sikorsky to assert its defense of government contractor immunity. This error would not have been prejudicial since Sikorsky prevailed. However, in the trial of the issue of whether there was a defect in the product on the theory of strict liability, error prejudicial to plaintiffs was committed which requires reversal.

I. Strict Liability—Defective Product

Plaintiffs contend the court prejudicially erred in admitting evidence Sikorsky complied with military specifications in designing the aircraft. Un-

---

[*]Assigned by the Chairperson of the Judicial Council.

[1]It could also be inferred the Navy maintenance personnel did not install both the nut and the cotter pin.

der plaintiffs' theory of strict product liability, such evidence was irrelevant to the claim of defect in the design and manufacture of the aircraft, and therefore inadmissible.[2]

 Under general rules of strict product liability, "[a] manufacturer is strictly liable in tort when an article he places on the market, knowing that it is to be used without inspection for defects, proves to have a defect that causes injury to a human being." (*Greenman* v. *Yuba Power Products, Inc.* (1963) 59 Cal.2d 57, 62 [27 Cal.Rptr. 697, 377 P.2d 897, 13 A.L.R.3d 1049].) The plaintiff need only establish product defect. Once the plaintiff proves the product's design proximately caused his injury, the burden shifts to the defendant to establish the benefits of the design outweigh its inherent dangers (*Barker* v. *Lull Engineering Co.* (1978) 20 Cal.3d 413, 431 [143 Cal.Rptr. 225, 573 P.2d 443, 96 A.L.R.3d 1]). The test for defective design "explicitly focuses the trier of fact's attention on the adequacy of the product itself, rather than on the manufacturer's conduct" (*id.* at p. 432). Thus, in strict liability cases, the immediate focus is on the product itself and *not* on the system that produced it (*Montez* v. *Ford Motor Co.* (1980) 101 Cal.App.3d 315, 319 [161 Cal.Rptr. 578]).

 Before trial, plaintiffs sought and received a ruling that, based on this court's decision in *Rawlings* v. *D. M. Oliver, Inc.* (1979) 97 Cal.App.3d 890, 896 [159 Cal.Rptr. 119], compliance with owner specifications is not a defense to claims of strict liability in tort. Plaintiffs' principal claim of product defect was the failure to include self-retaining bolts in the flight control linkage of the aircraft. Plaintiffs further objected, again before trial, to the introduction of evidence Sikorsky recommended self-retaining bolts but the Navy refused this recommendation. The court then ruled such evidence would be admissible for purposes of determining whether there was a defect.

On the issue of whether there was a defect in the product, the court improperly allowed the jury to consider the Navy specifications as even a *factor* in determining whether the aircraft's design was defective.

 Sikorsky claims it was plaintiffs who first introduced evidence of military specifications in an effort to prove Sikorsky's noncompliance, and therefore any error was "invited" by them. However, the record reveals that before the jury was impaneled, the court ruled it would permit Sikorsky to present evidence of military specifications on the issue of defect. Plaintiffs objected and, only in response to this ruling, introduced evidence of military

---

[2]For purposes of discussion of product defect under strict liability, we defer the issue of government contractor immunity. See discussion on that issue, *post.*

plans and specifications to prove a defect existed. In compliance with the court's ruling and in anticipation of Sikorsky's evidence, plaintiffs were entitled to refer to military specifications as a necessary and proper trial tactic without waiving the error. "An attorney who submits to the authority of an erroneous adverse ruling, after making appropriate objections, does not waive the error in the ruling by introducing responsive evidence to offset or explain the erroneously admitted evidence so far as possible." (*Hoel* v. *City of Los Angeles* (1955) 136 Cal.App.2d 295, 310 [288 P.2d 989].) Plaintiffs neither invited nor waived the error.

██ Plaintiffs further contend failure to instruct the jury that compliance with government specifications is not a defense to the claim the product was defective was reversible error. Plaintiffs proffered, and the court refused, the following instruction: "It is not a defense to a claim that a product is defective that the manufacturer built the product, in this case the helicopter, in accordance with government standards or specifications."

██ Generally, the jury need only be instructed on a particular point where such instruction finds support in the evidence (*LeMons* v. *Regents of University of California* (1978) 21 Cal.3d 869, 875 [148 Cal.Rptr. 355, 582 P.2d 946]). ██ Had the court precluded all evidence of government specifications, plaintiffs' proffered instruction may not have been warranted. However, because the court allowed evidence of military specifications on the issue of whether the aircraft was defective, plaintiffs' instruction was essential to the jury's understanding of strict product liability. Further, Sikorsky's counsel argued at length, in spite of the court's *in limine* ruling, Sikorsky complied with Navy specifications in designing the aircraft, and that this was a factor showing the product was not defective. Without a proper instruction, the jury was given the erroneous impression Sikorsky's following of government plans and specifications was evidence there was no defect in the product. The "feasibility of alternative design" factor described in *Barker* v. *Lull Engineering Co., supra,* 20 Cal.3d 413, allows a consideration of physical or mechanical feasibility, rather than administrative or bureaucratic feasibility, and does not include the necessity to comply with owner specifications. The court's refusal to instruct the jury on this essential point was prejudicial error and requires reversal.

██ Plaintiffs next contend evidence that Sikorsky designed and constructed the helicopter in accord with the existing state of the art was irrelevant and prejudicial to their case. The contention is not properly cognizable on appeal since it was plaintiffs' own expert Gaines who, in the words of the trial court, "gratuitously added this state-of-the-art business" and only plaintiffs' witnesses used "state of the art" phraseology. Moreover, the jury was properly instructed on the "risk-benefit" standard under *Barker* v. *Lull*

*Engineering Co., supra,* 20 Cal.3d 413, to the effect that once a plaintiff proves the product's design proximately caused injury, the burden of proof is on the defendant "to establish, in light of the relevant factors, that, on balance, the benefits of the challenged design outweigh the risk of danger inherent in such design" (*id.* at p. 432). Among the relevant factors, and peculiarly within the manufacturer's knowledge, are the feasibility and cost of alternative designs (*id.* at p. 431). It seems apparent that evidence the design comported with the state of the art is relevant to a proper determination of such cost and feasibility factors (see *Garcia* v. *Joseph Vince Co.* (1978) 84 Cal.App.3d 868, 878-879 [148 Cal.Rptr. 843]; *Buccery* v. *General Motors Corp.* (1976) 60 Cal.App.3d 533, 547 [132 Cal.Rptr. 605]). In reaching this conclusion, we recognize the rule, not involved in this case, that evidence of industry custom and usage is irrelevant in a products liability case (see *Grimshaw* v. *Ford Motor Co.* (1981) 119 Cal.App.3d 757, 803, 804 [174 Cal.Rptr. 348]; and see *Barker* v. *Lull Engineering Co.,* *supra,* 20 Cal.3d 413, 426). The distinction between what are the capabilities of an industry and what practice is customary in an industry must be kept in mind. There was no error here in admitting the state of the art evidence showing industry capability.

■ Hieter also unmeritoriously contends the trial court erred in admitting testimony of Sikorsky expert witness Gary Fowler after Hieter's own expert witness, Thomas J. Murphy, changed his opinions on the stand from those disclosed by his deposition, taking a point of view more harmful to Sikorsky than it was in the deposition. Hieter claims surprise because he was not told Fowler would be an expert for Sikorsky.[3]

In light of the surprise Murphy's changed testimony represented, it was fully appropriate for Sikorsky's counsel to bring in a new expert to contradict the changes. A fair trial required the new testimony, notwithstanding Hieter did not know of Fowler beforehand. There was no error here.

## II. Government Contractor Immunity

■ The trial court ruled the defense of government contractor immunity was not available to Sikorsky. Such defense, however, should have been available to Sikorsky if it could establish the necessary elements.

■ In *McKay* v. *Rockwell Intern. Corp.* (9th Cir. 1983) 704 F.2d 444, the court held a supplier of military equipment is not subject to strict lia-

---

[3]Citing 78 pages of reporter's transcript testimony of Murphy, Hieter says his expert "refined his opinion somewhat." Putting it nicely, Hieter euphemizes, for his expert very substantively changed his deposition testimony with respect to the amount of G-forces the copilot's seat track could withstand and the concept on which his opinion was based.

bility for a design defect where: "(1) the United States is immune from liability under *Feres* [*Feres* v. *United States,* 340 U.S. 135 (95 L.Ed. 152, 71 S.Ct. 153)] and *Stencel* [*Stencel Aero Engineering Corp.* v. *United States,* 431 U.S. 666 (52 L.Ed.2d 665, 97 S.Ct. 2054)], (2) the supplier proves that the United States established, or approved, reasonably precise specifications for the allegedly defective military equipment, (3) the equipment conformed to those specifications, and (4) the supplier warned the United States about patent errors in the government's specifications or about dangers involved in the use of the equipment that were known to the supplier but not to the United States." (*Id.* at p. 451.)

The question of whether military suppliers such as Sikorsky should be liable for defective product designs where the United States set or approved the design specifications is a federal one, implicating federal interests. ▆▆▆▆ "To whatever extent state law may apply to govern the relations between soldiers or others in the armed forces and persons outside them or nonfederal governmental agencies, the scope, nature, legal incidents and consequences of the relation between persons in service and the Government are fundamentally derived from federal sources and governed by federal authority. [Citations.] So also we think are interferences with that relationship" (*United States* v. *Standard Oil Co.* (1947) 332 U.S. 301, 305-306 [91 L.Ed. 2067, 2070-2071, 67 S.Ct. 1604, 1607]). Torts committed by a military aircraft manufacturer against active duty military personnel is an example of such "interferences" with the relationship between members of the armed forces and the government. Therefore, a substantial federal interest is at stake in this lawsuit.

▆▆▆▆ Further, although tort claims are traditionally matters for state law, regulation of federal weapons and equipment manufactured by government contractors for federal military personnel should not be left to the states. "Application of varying state laws would burden federal interests by creating uncertainty as to the rights of both veterans and war contractors. It would also be unfair in that essentially similar claims, involving veterans and war contractors identically situated in all relevant respects, would be treated differently under different state laws." (*In re Agent Orange Product Liability Litigation* (E.D.N.Y. 1979) 506 F.Supp. 737, 748, reversed on other grounds, 635 F.2d 987 (2d Cir. 1980).

Finally, California law has not addressed the issue of a government contractor's tort liability for design defect of a product where the government supplied specifications.[4] State law would not be displaced by the application

---

[4]Although the trial court found *Rawlings* v. *D. M. Oliver, Inc., supra,* 97 Cal.App.3d 890, applied here, that case involved the liability of a nonmilitary manufacturer who had built a product in accord with plans and specifications furnished by the owner. The issue

of federal law (see *In re Agent Orange Product Liability Litigation, supra,* 506 F.Supp. 737, 749). Thus, the law of this case will be as enunciated in *McKay* v. *Rockwell Intern. Corp., supra,* 704 F.2d 444.

Because this case was not tried on the issue of whether Sikorsky is immune from liability under a government contractor defense theory, both parties are now entitled to a full determination on that issue. We strongly recommend the case be bifurcated and the government contractor immunity issue be resolved first.

The judgment is reversed and the case is remanded for proceedings consistent with this opinion.

**WIENER, J.,** Concurring and Dissenting.– I agree with result reached by Judge Lewis in the lead opinion that reversal is required because of the prejudicial error arising from the court's failure to give plaintiffs' requested instruction that the jury be told compliance with government specifications was not a defense. (See majority opn., pt. I, *ante,* pp. 207-210.) I strongly disagree with the majority, however, that upon retrial Sikorsky may assert the defense of government contractor immunity. (See *id.,* pt. II, *ante,* pp. 210-212.)

I believe the determination of whether California should adopt the so-called government contractor defense as part of its common law should turn on whether federal interests require the elimination of the sound principles of strict tort liability carefully articulated by the California Supreme Court over the last two decades. The majority's rejection of state law and adoption of the holding in *McKay* v. *Rockwell Intern. Corp.* (9th Cir. 1983) 704 F.2d 444 represents, in my view, a skewed cost benefit analysis where the costs are borne by the injured claimants and benefits in the form of increased profits accrue to private manufacturers. Excluding those times of declared war or states of emergency which inject special considerations, I conclude the interests of both the federal and state governments are served when our military personnel are provided with sound and reliable equipment designed and manufactured without defects.

Preliminarily, it should be stressed that the significant question of whether a manufacturer should be immunized from liability under the government contractor defense is a matter of state, not federal, law. (*Brown* v. *Caterpillar Tractor Co.* (3d Cir. 1982) 696 F.2d 246, 249; *In re Agent Orange Product Liability Litigation* (2d Cir. 1980) 635 F.2d 987, cert. den., 454

---

here, however, is whether strict liability applies to manufacturers of military equipment that proves to be defective and injures members of the armed forces who are on active duty. Thus, *McKay* v. *Rockwell Intern. Corp., supra,* 704 F.2d 444, is directly on point.

U.S. 1128 [71 L.Ed.2d 116, 102 S.Ct. 980].)[1] It should also be noted that neither the federal nor state Legislatures have suggested as a matter of national or local policy that an exception to the general application of strict products liability should be made in favor of those manufacturers who happen to sell their products to the federal government. It is also clear that acceptance of the government contractor defense has lacked unanimity. A few courts have flatly rejected the doctrine. (See *Challoner* v. *Day and Zimmermann, Inc.* (5th Cir. 1975) 512 F.2d 77, 84, vacated and remanded on choice of law grounds in 423 U.S. 3 [46 L.Ed.2d 3, 96 S.Ct. 167]; *Johnston* v. *United States* (D.Kan. 1983) 568 F.Supp. 351, 356-359; see also Note, *The Government Contract Defense in Strict Liability Suits for Defective Design* (1981) 48 U. Chi. L.Rev. 1030. Contra *McKay* v. *Rockwell Intern. Corp., supra,* 704 F.2d 444; *Brown* v. *Caterpillar Tractor Co., supra,* 696 F.2d 246; *In re Agent Orange Products Liability Litigation* (E.D.N.Y. 1980) 506 F.Supp. 762; *Sanner* v. *Ford Motor Company* (1976) 144 N.J.Super. 1 [364 A.2d 43], affd., 154 N.J.Super. 407 [381 A.2d 805], cert. den., 75 N.J. 616 [384 A.2d 846]; *Casabianca* v. *Casabianca* (1980) 104 Misc.2d 348 [428 N.Y.S.2d 400].) Even *McKay* lacks unanimity. The dissent by Judge Alarcon thoughtfully and critically rejects the application of the government contractor defense for policy reasons grounded on both state and federal concerns. (See *McKay* v. *Rockwell Intern. Corp., supra,* 704 F.2d at pp. 456-464 (dis. opn. of Alarcon, J.).)

Strict product liability in California holds manufacturers and designers responsible for injuries caused by their products where the manufacturer places the product on the market knowing the product will be used without inspection for defects and the product proves to have a defect causing injury. (*Greenman* v. *Yuba Power Products, Inc.* (1963) 59 Cal.2d 57, 62 [27 Cal.Rptr. 697, 377 P.2d 897, 13 A.L.R.3d 1049].) Accordingly, where a product defect is established, the injured claimant may recover against the manufacturer or designer without the added burden of proving negligence in the design or manufacture of the product. (*Barker* v. *Lull Engineering Co.* (1978) 20 Cal.3d 413, 418, 431 [143 Cal.Rptr. 225, 573 P.2d 443, 96 A.L.R.3d 1].) The trial of a products liability case thus focuses on the product itself and not on the system that produced the product. (*Montez* v. *Ford Motor Co.* (1980) 101 Cal.App.3d 315, 319 [161 Cal.Rptr. 578].) Whether the completed product comports with the plans and specifications submitted for its manufacture becomes irrelevant. (See *Rawlings* v. *D. M. Oliver, Inc.* (1979) 97 Cal.App.3d 890, 896-897 [159 Cal.Rptr. 119].)

---

[1] The lead opinion quotes from *In re Agent Orange Product Liability Litigation* (E.D.N.Y. 1979) 506 F.Supp. 737, 748, rev., 635 F.2d 987 to support the use of federal law. (See slip opn., pt. II, p. 10.) Although that statement was not expressly rejected by the Second Circuit, the holding of the district court, applying federal common law to the litigation, was reversed. (*In re Agent Orange Product Liability Litigation, supra,* 635 F.2d at p. 995.)

It should again be emphasized the case before us does not involve the interrelated but distinct contract specifications defense. (See generally Note, *Liability of a Manufacturer for Products Defectively Designed by the Government* (1982) 23 B.C.L.Rev. 1025.) Sikorsky appears to concede the correctness of the principle recognizing the contract specification defense has its source in ordinary negligence principles and accordingly does not apply to actions grounded in strict liability. (*Johnston* v. *United States, supra,* 568 F.Supp. at p. 354.) Furthermore, although the government contract defense has been recognized by the United States Supreme Court and by California courts in the context of public works cases (see *Yearsley* v. *Ross Constr. Co.* (1940) 309 U.S. 18 [84 L.Ed. 554, 60 S.Ct. 413]; *Smith* v. *Lockheed Propulsion Co.* (1967) 247 Cal.App.2d 774, 787-788 [56 Cal.Rptr. 128, 29 A.L.R.3d 538]),[2] this does not compel the conclusion the defense is proper in a strict product liability case.

In *Smith,* the court refused to extend the defense to an ultrahazardous activity—strict liability situation. In support of its conclusion, the court pointed to several factors, including the anachronistic nature of the sovereign immunity doctrine for torts (citing *Muskopf* v. *Corning Hospital Dist.* (1961) 55 Cal.2d 211, 216 [11 Cal.Rptr. 89, 359 P.2d 457]) and the fact that as between an innocent landowner and a contractor, no compelling reason justified extending the immunity. (*Smith* v. *Lockheed Propulsion Co., supra,* 247 Cal.App.2d at p. 791.) This last reason is particularly applicable here, especially when the importance placed on protecting consumers and other users of products is considered.

There can be no doubt on how the California Supreme Court views the doctrine of strict liability. From its genesis in *Greenman* to the present, our high court has repeatedly expressed the rule of strict liability be broadly applied to assure that otherwise defenseless victims recover damages from those manufacturers or designers who have placed defective products in the stream of commerce. (See, e.g., *Price* v. *Shell Oil Co.* (1970) 2 Cal.3d 245, 251 [85 Cal.Rptr. 178, 466 P.2d 722].) Notwithstanding the presence of some federal interest in this case, there is no reason, nor does the majority suggest any, to abandon California precedent on this issue.

*McKay* rejected strict products liability because the rationale for that doctrine was inapplicable where a manufacturer sold military equipment to the

---

[2]The general rule is "that in the absence of negligence or unauthorized departure from plans and specifications, a contractor engaged in the construction of a public improvement under a contract with a public body is not liable for consequential injury to adjacent property that may result as a necessary incident from the prosecution of the work in accordance with the terms of the contract and the plans and specifications. [Citations.]" (*Smith* v. *Lockheed Propulsion Co., supra,* 247 Cal.App.2d at p. 787.)

government. (*McKay* v. *Rockwell Intern. Corp., supra,* 704 F.2d at pp. 451-453.) Since I believe Judge Alarcon's dissent thoroughly refutes the arguments made by the majority in *McKay* and presumably accepted by this court, little is gained by my repeating each of the contentions, pro and con. (See *id.,* at pp. 457-461 (dis. opn. of Alarcon, J.).)

Briefly, however, there is nothing in *McKay* nor is there anything here to suggest the manufacturer was forced to enter into a contract with the government. To say there was no room for price negotiation is to naively and incorrectly assume sellers to the military are unconcerned with profit. Manufacturers engaged in the free enterprise system are able to obtain cost savings enabling them to be more competitive. Because the military can accept lower bids, competition will be sharpened with reduced costs for an improved product. Thus, the net effect of applying strict product liability is to get a safer product at a lower cost. (See *McKay* v. *Rockwell Intern. Corp., supra,* 704 F.2d at p. 457 (dis. opn. of Alarcon, J.).) It is not only legally unseemly, but economically foolhardy for this court to unnecessarily intrude into the free market system. That system functions to ensure cost transfers will be minimized. "Just as some manufacturers are better at minimizing the cost of overhead, others will be better at producing safe designs and avoiding liability. Bid price competition and the cost of liability provide incentives to minimize both. . . . As long as our economy continues as a free market system this court should refrain from denying its realities." (*Id.,* at pp. 457-458 (dis. opn. of Alarcon, J.).)

*McKay* also appears to turn on what might be labeled as a federal fireman's rule (see *Hubbard* v. *Boelt* (1980) 28 Cal.3d 480 [169 Cal.Rptr. 706, 620 P.2d 156]) by referring to the generous military compensation under the Veteran's Benefit Act. *McKay* states strict liability increases that compensation and "it can hardly be said that any such increase was anticipated at the time of enlistment." (*McKay* v. *Rockwell Intern. Corp., supra,* 704 F.2d at p. 452.) This unsupported premise, however, presupposes that for some unknown reason military personnel bargain for defective products when they enlist. I am unaware of any law, statutory or otherwise, or any articulated public policy that says military personnel should face an increased risk of harm due to defective products when they enter military service.

*McKay* also relies upon the assumption members of the armed forces are not ordinary consumers with respect to military equipment and "[t]o regard them as ordinary consumers would demean and dishonor the high station and public esteem to which, because of their exposure to danger, they are justly entitled." (*McKay* v. *Rockwell Intern. Corp., supra,* 704 F.2d at p. 453.) I cannot accept this. Like Judge Alarcon, I believe "Military personnel are honored and esteemed because they are willing to fight for their

country and risk their lives doing so. They are not so respected because they are sometimes forced by their calling to use unsatisfactory or unsafe equipment. It is the Military's, Rockwell's and this court's duty to insure that our servicemen are provided with reliable and safe equipment. Just as the Military can make any parachute packer take one that he has just folded and make him jump with it, the court should require that Rockwell stand behind the products for which it voluntarily contracts and provides at a profit. To extend the contractor defense in the way the majority suggests will only result in more unsafe and unreliable equipment. To do so would unnecessarily increase the danger which our military personnel face so patriotically." (*Id.*, at p. 461, fn. omitted (dis. opn. of Alarcon, J.).)

In summary, a manufacturer, here Sikorsky, the entity best able to avoid the costs of damages incurred when its defective product entered into the stream of commerce, should bear the costs of those damages. Strict products liability was made a part of California law for valid legal and policy considerations. There is no legal or policy justification in this case to depart from that law. Upon retrial I would exclude the government contractor defense.

**COLOGNE, Acting P. J.,** Concurring and Dissenting.— I concur in part II of the lead opinion adopting for California the defense of government contractor immunity to actions by military personnel for damages from defective equipment developed according to government specifications. While I am persuaded by the federal authority represented in this circuit by *McKay* v. *Rockwell Intern. Corp.* (9th Cir. 1983) 704 F.2d 444, I do have misgivings about the legal and practical efficacy of the fourth element of the defense requiring a showing the supplier warned the United States about patent errors in the specifications and of dangers in the use of the equipment known to the supplier but not the United States. I point out it has been held state law, not federal law, governs the status and nature of the government contractor defense (*Brown* v. *Caterpillar Tractor Co.* (3d Cir. 1982) 696 F.2d 246, 249). Thus, there is room in the law for establishing a rule without the warning requirement. Moreover, other cases, including Ninth Circuit cases, do not express a rule incorporating a duty to warn (see, e.g., *Sanner* v. *Ford Motor Co.* (1977) 154 N.J.Super. 407 [381 A.2d 805, 806], affirming summary judgment granted in 144 N.J.Super. 1 [364 A.2d 43, 45-47], on basis of government contractor defense; see also *Myers* v. *United States* (9th Cir. 1963) 323 F.2d 580, 583; *Merritt, Chapman & Scott Corp.* v. *Guy F. Atkinson Co.* (9th Cir. 1961) 295 F.2d 14, 16). I would hold, however, the policy considerations expressed at length in *McKay, supra,* provide ample reason for granting said immunity.

I dissent from that portion of part I, relating to strict liability, which calls for reversal because the trial court improperly allowed the jury to consider

the Navy specifications as even a factor in determining whether the aircraft's design was defective and because the trial court refused to instruct compliance with government specifications is not a defense to the claim the product was defective.

In my view, the lead opinion's position on the first point is based on a reading of the record that accepts plaintiffs' characterization of it, but does not reflect what actually occurred. As I read the record, plaintiffs themselves initiated the introduction of the evidence of military plans and specifications without any compulsion or coercion as a result of an adverse ruling. Accordingly, the plaintiffs cannot be heard to complain of error in the admission of that evidence (see *Abbott* v. *Cavalli* (1931) 114 Cal.App. 379, 383 [300 P. 67]), and there was no error in permitting Sikorsky to argue to the jury that the compliance with military specifications could be considered as a factor in determining whether the aircraft's design was defective.

In connection with the record, on March 20, 1981, plaintiffs filed a trial brief with reference to motions *in limine,* the first topic of which was "THE FACT THAT THE AIRCRAFT IN QUESTION WAS BUILT TO GOVERNMENT SPECIFICATIONS IS NOT A DEFENSE TO LIABILITY ON THE PART OF THE MANUFACTURER, SIKORSKY, ON A PRODUCTS LIABILITY THEORY."

In the text underlying this contention, plaintiffs mentioned "[f]urther, the fact that Sikorsky made a recommendation that the Navy should *purchase* redundant fasteners in 1973 is not a defense to Sikorsky being held liable for a defect in the product." (Italics in original.) Plaintiffs then discussed the issue of whether building to government specifications is a defense and concluded, in part: "Therefore, it is the plaintiffs' position that the fact that the product in question was manufactured to government specifications *and* that the redundant fastener was suggested to the Navy and rejected should not provide a defense to the defendant Sikorsky in this case. Further, since the offer to the government to sell them redundant fasteners and the rejection thereof would so totally confuse the issues in this case, it is requested that evidence of that circumstance be excluded by the trial court and the defendants not be permitted to refer to that subject. . . . If the trial court were to permit Sikorsky to put on evidence that they had recommended a change to the Navy and the Navy had refused, the jury would be allowed to focus on the question of whether or not Sikorsky's conduct was reasonable. The reasonableness or lack thereof of Sikorsky's conduct insofar as trying to remedy the defect in question is not an issue in the case. Such evidence would obfuscate the issue that the jury has to decide and cause prejudicial error to the plaintiffs." (Italics added.)

The trial court's memorandum ruling on motions *in limine* dated April 3, 1981, addressed only the portion of the motion going to the exclusion of

evidence of compliance with government specifications. The ruling reads: "3. Building to government specifications. Granted. As previously anunciated [*sic*], the formula for recovery for a defective product has no exception stated in a California case for those conforming to customer specifications, government or otherwise. Such California authority as exists suggests there is no such exception (*Rawlings* v. *Oliver,* 97 Cal.App.3d 890, 896). Authorities from elsewhere do not persuade me to create such an exception, either because they do not emanate from an appellate court or they seem to rationalize from the duty of the manufacturer rather than the safety of the product."

Then, on April 28, 1981, before the jury was sworn, the matter of the admissibility of evidence of Sikorsky's offer to sell the Navy self-retaining bolts and the Navy's rejection of that offer was discussed, in relevant part, as follows:

"THE COURT: Let the record show that Counsel are informing Court in chambers in absence of the jury upon a point of evidence, and Mr. Milliken [plaintiffs' counsel] is urging me to exclude by order mentioning of the offer of Sikorsky to furnish more secure nuts after the manufacturing of the accident plane and before the accident.

"Is that your point, Mr. Milliken?

"MR. MILLIKEN: Well, I think the point that is inadmissible is the offer by Sikorsky to the Navy to sell them self-retaining bolts and the Navy's decision not to accept that offer.

"I think that falls squarely within the Court's ruling on compliance with government specifications not being a defense in this case.

"THE COURT: Well, as I indicated off the record, I believe it does not relate to specifications, and I would be erring if I excluded it because I can think of many examples of products which might be made more safe by such a proposal. I think it's part of the case.

"I will give you any kind of a record you'd like if you would care to make an objection at this time.

"MR. MILLIKEN: I've made it. The point that I would point out is this: That if the Court allows this, then we're going to have to go into the specifics of the offer, the degree of urgency that was associated with it, by the recommendation made by Sikorsky, the cost.

"In other words, Mr. Morris indicated—Commander Morris indicated that the reason that he did not accept the recommendation was strictly an expense situation, and to my way of thinking, the situation is analogous to the famous example of the safety guard on the lawn mower being sold as an extra after the fact, and the court in that case held that the product was defective without it.

"The fact that the manufacturer offers to sell the part that makes the device safe after the fact as an add-on at a substantial additional expense and really doesn't acknowledge the matter as a matter of safety-in-flight, but says, 'That's a good idea, but you can make your own decision about it,' I think causes the situation to be far different than the one hypothesized by Mr. Brewster where the manufacturer was refused the opportunity to make the aircraft safe.

"The VH-3, for example, and the Black Hawk subsequent aircraft sold both to the Army and Navy have self-retaining bolts in them as they came off the line. I mean, they were accepted that way.

"THE COURT: I'm satisfied in the matter that the subject has been properly gone into, and I will give you your record.

"For the purpose of this ruling, I will assume that both on opening statement and by offer of competent testimony, the defendant has attempted to mention an offer of proof on the subject which you related. I will entertain your objection and the way you stated it and will overrule the objection."

This ruling quite clearly deals with the admissibility of the offer made by Sikorsky and does not constitute a ruling permitting Sikorsky to present evidence of military specifications on the issue of defect.

After these rulings, the trial court made it quite clear, even as early as during Sikorsky's opening statement,[1] it was not going to permit evidence of compliance with government standards as complete proof of a nondefective product. As it said, "[u]nder the *Rawlings* case—that's no exoneration."

It must be pointed out, however, plaintiffs' second expert witness, William Gaines, opened the door permitting the use of the government specifications. He testified he believed the flight linkage was defective because it

---

[1]When Sikorsky's counsel, Mr. Brewster, stated in the opening statement the helicopter was built pursuant to a particular regulation and plaintiffs objected, the trial court said, "Let's stay away from the subject, Mr. Brewster, if I were you."

did not have a "redundant" fastener and he stated in the 1950s there was a "military standard" for a self-retaining bolt approved for use in flight control linkages. He admitted his only source of knowledge in this regard was the military standards in effect prior to 1963. A military standard, he stated, is "a piece of equipment that has met military specifications and is approved for use." The military standards dated October 7, 1954 were produced and identified for him, and provided for a self-locking bolt, not a self-retaining bolt. Under cross-examination Mr. Gaines admitted this military standard was cancelled on September 9, 1960 almost three years before this aircraft was delivered. The cancellation notice read that "These cancelled parts are not suitable for any use in any application. Safety of Flight May Be Involved."

On redirect Gaines altered his position and asserted it was the self-locking nuts that should have been used. This put his testimony in conflict with plaintiffs' first expert since he had testified the self-locking nuts were not used on flight control linkage because they could be used only once and were a cost factor where periodic maintenance required removal.

Dr. Joseph McKinley, plaintiffs' next expert, admitted on cross-examination the military standard for the self-retaining bolt had been cancelled and no new standard adopted. The issue of a military standard had clearly been put in issue as the basis for plaintiffs' expert opinions. Thus, evidence of the specifications for an aircraft delivered in 1963 was proper to show there was a military standard contrary to the plaintiffs' experts' understanding, namely military specifications which were approved for use. Thus, Gaines and the other experts who relied on a deviation from military standards to find a defect were lacking in credibility. When the specifications were offered the court gave the jury the following admonition:

"THE COURT: . . . Sometimes evidence comes in for all purposes upon a trial; sometimes for a limited purpose. And a good example of referring evidence for a limited purpose only is in the testimony of one who offers himself as an expert witness, as this gentleman has done.

"In this case, we are entitled to look upon what he relies on in giving his testimony and his opinion for the purpose of weighing that opinion and determining its credibility. Sometimes that material is not otherwise important.

" . . . . . . . . . . . . . . . . . . . .

"I'm allowing it in for the purpose of allowing you to weigh his credibility upon that point. With that limited purpose and none other . . . ."

Under these circumstances where plaintiffs introduced the issue of specifications in their case in chief, they cannot be heard to complain of error in the admission of that evidence (see *Abbott* v. *Cavalli, supra,* 114 Cal.App. 379, 383).

Nor can I accept plaintiffs' representation Sikorsky asserted a "government contracts defense" during the trial. The record does not support that characterization of Sikorsky's position. In closing argument, Sikorsky essentially conceded plaintiffs' position it is no defense to Sikorsky that it did not use the self-retaining type of fastener because this was not allowed by the specifications.[2] Instead, the thrust of Sikorsky's argument was compliance with specifications is a factor to be considered in determining whether the design of the helicopter was defective.

In light of the evidence of specifications which had been introduced, much at plaintiffs' request, Sikorsky's argument was proper. The jury could consider the specifications evidence as a factor in determining whether the helicopter's design was defective. In *Barker* v. *Lull Engineering Co.* (1978) 20 Cal.3d 413 [143 Cal.Rptr. 225, 573 P.2d 443, 96 A.L.R.3d 1], the Supreme Court advises what a jury may consider, as follows (at p. 431): "[I]n evaluating the adequacy of a product's design pursuant to this latter standard, a jury may consider, among other relevant factors, the gravity of the danger posed by the challenged design, the likelihood that such danger would occur, the mechanical feasibility of a safer alternative design, the financial cost of an improved design, and the adverse consequences to the product and to the consumer that would result from an alternative design. [Citations.]"

As is evidenced, for example, by the September 9, 1960, cancellation statement about the self-retaining bolt, referring to safety of flight, the specifications concerned themselves with and are thus relevant to such matters as the gravity of the danger posed by the challenged design and the likelihood such danger would occur. *Barker* permits jury consideration of evidence of specifications going to the danger factor in evaluating the ade-

---

[2]During argument, Sikorsky's counsel spoke about specifications and said, in part:

"Furthermore—and Mr. Milliken [plaintiffs' counsel] says, 'It's no defense to Sikorsky that they didn't do something because it wasn't specified by the military.'

"Maybe it's not, maybe it's not. The Court isn't going to tell you that Sikorsky isn't liable if they followed the military specifications. The Court is not going to give you that instruction of law, but it is a factor that you consider in deciding whether it is defective.

". . . . . . . . . . . . . . . . . . . .

"They [self-locking type nuts] are not allowed by the Government, for whom we are building the aircraft.

"Mr. Milliken says, 'That's no defense to Sikorsky.' But you are entitled to consider it in deciding whether it is defective."

quacy of a product's design. In my view, there was no error in admitting the evidence of specifications.

The court had by its instruction given the jury no cause to believe that simply by complying with the government specifications Sikorsky would be free of liability. As Justice Lewis admits, if the specifications had not been admitted it would not be error to refuse the instruction that compliance with the specifications would not be a defense. If that be so, then how could it be error when the jury was told those specifications could be considered only for the purpose of impeaching the credibility of the plaintiffs' experts? Every effort was made to keep that defense from the jury, and counsel for Sikorsky even made it clear in his summation Sikorsky was not relying on such a defense. (See fn. 2, *ante.*) The jury was not misled as to the basis for recovery and the instruction was unnecessary. While it might have been given, it was not error to refuse the proffered instruction.

I would affirm the judgment of the trial court but if this is to be retried I would concur with the lead opinion the governmental contractor defense should be allowed.