[No. B174512. Second Dist., Div. Four. Feb. 27, 2007.]

PEARL O'NEILL et al., Plaintiffs and Appellants, v.
NOVARTIS CONSUMER HEALTH, INC., Defendant and Respondent.

## COUNSEL

Robinson, Calcagnie & Robinson, Mark P. Robinson, Jr., Sharon J. Arkin; Lopez, Hodes, Restaino, Milman & Skikos, Ramon Rossi Lopez, Steve Skikos and Melinda Davis-Nokes for Plaintiffs and Appellants.

Kaye Scholer, Aton Arbisser, Jan E. Dodd, Tanja K. Shipman, Joshua Stambaugh and Randolph S. Sherman for Defendant and Respondent.

## OPINION

**EPSTEIN, P. J.**—This is an appeal from a defense verdict in two cases tried concurrently in coordinated litigation against Novartis Consumer Health,

Inc.,[1] the manufacturer of pharmaceutical products containing phenylpropanolamine (PPA). Appellants claim the court erred in refusing to instruct the jury that compliance with government standards cannot be considered as a basis for assessing the safety of a product in a design defect claim. They claim the court erroneously allowed respondent to present evidence which did not meet the admissibility standards established in *People v. Kelly* (1976) 17 Cal.3d 24 [130 Cal.Rptr. 144, 549 P.2d 1240] to challenge the findings of an epidemiological study on the safety of PPA. They assert the court erred in allowing Novartis to present evidence implying that the Food and Drug Administration (FDA) affirmatively approved the marketing of Novartis's PPA products while precluding appellants from utilizing contradicting evidence in their opening statement or their case in chief. They also claim error in other evidentiary rulings. We find no error and affirm the judgment.

## FACTUAL AND PROCEDURAL SUMMARY

We begin with background on PPA, the pharmaceutical ingredient which is at the center of this action. Novartis used PPA as the active ingredient for nasal decongestion in two cough and cold products, Triaminicin and Tavist-D.[2] Because the ingredient was in commercial use prior to 1972, it was "grandfathered" into FDA approval, subject to a three-phase monograph process for determining whether it was safe and effective. Under the relevant federal law, monographed drugs could be legally marketed pending the FDA's final determination on their safety and efficacy. (21 C.F.R. § 330.10 (2006).)

In 1976, the FDA began the first stage in the monograph process for cough and cold products, including PPA. In January 1985, the FDA issued its first formal position on PPA as part of the second phase of its process, the tentative final monograph for over-the-counter nasal decongestant products. The FDA did not categorize PPA as safe and effective, due to concerns that it elevated blood pressure. At the same time, the FDA tentatively approved another decongestant, pseudoephedrine, as safe and effective. Because of FDA concerns about the safety of PPA, in 1992 a pharmaceutical industry trade association proposed to the FDA that an epidemiological study be conducted. Association members funded the study, which came to be known as the "Yale Study," or "Hemorrhagic Stroke Project."

In August 1994, the FDA published its final rule for over-the-counter nasal decongestant products, the third phase of its monograph process. The FDA

---

[1] Defendant Novartis Consumer Health (Novartis) was formed in 1997 by the merger of two companies (Ciba and Sandoz), which manufactured the PPA-containing products at issue in this action.

[2] PPA also was used in over-the-counter appetite suppressants.

issued final approval of pseudoephedrine as safe and effective, but deferred categorization of PPA, explaining: "[B]ecause of still unresolved safety issues concerning phenylpropanolamine preparations, the agency is deferring action on this drug. . . . Therefore, phenylpropanolamine preparations will not be categorized or further discussed in this document."

The Yale Study results were submitted to the FDA on May 10, 2000. On October 19, 2000, members of the nonprescription drugs advisory committee for the FDA's Center for Drug Evaluation and Research conducted a hearing on the safety of PPA in light of the Yale Study findings. The panel concluded that PPA was unsafe and recommended to the FDA that PPA be removed from the market.

On November 3, 2000, the FDA advised PPA manufacturers that it intended "to initiate rulemaking to classify phenylpropanolamine as non-monograph (not generally recognized as safe and effective) for [over-the-counter] use" and that "as an interim measure to protect the public health, you should voluntarily discontinue marketing any drug products containing phenylpropanolamine." PPA manufacturers, including Novartis, immediately removed all products containing PPA from the market. On August 14, 2001, the FDA published in the Federal Register its proposal to withdraw approval, in which it declared its intention to withdraw approval of all products containing PPA because of "the association [of] phenylpropanolamine [with] increased risk of hemorrhagic stroke."

Appellants are two women who suffered strokes which they attribute to their use of Novartis products containing PPA. Linda Lutz was 48 years old when she suffered an intracerebral hemorrhage in May 1996. She had used Triaminicin, a Novartis product which contained PPA. Ms. Lutz is confined to a wheelchair due to paralysis of the left side of her body. Pearl O'Neill suffered an intracerebral hemorrhage in March 1995, following her first use of Tavist-D, a Novartis product containing PPA. She was 35 years old at the time.

Ms. O'Neill and Ms. Lutz each filed suit against Novartis. Their actions were consolidated with all other statewide PPA cases. After consolidation, a master complaint and master answer were drafted and adopted. The O'Neill and Lutz cases were selected for a consolidated trial. The cases went to the jury on three causes of action: strict liability design defect,[3] strict liability failure to warn, and fraud by concealment. After a lengthy trial, the jury returned defense verdicts on all causes of action. This is a timely appeal from the judgment in favor of Novartis.

---

[3] Novartis sought summary judgment on the design defect cause of action, asserting that over-the-counter pharmaceuticals are not subject to strict liability based on design defect. This was an attempt to expand the holding in *Brown v. Superior Court* (1988) 44 Cal.3d 1049 [245

## DISCUSSION

### I

Appellants assert prejudicial error resulted from the court's admission of FDA evidence and its failure to limit the jury's use of that evidence with respect to the design defect claim. We begin with the claim of instructional error.

Appellants assert the court erred in refusing to instruct the jury that compliance with government standards cannot be considered as a basis for assessing the safety of a product in a design defect claim. At different points during the trial, appellants submitted special instructions which explained that compliance with FDA rules does not preclude liability for design defect. They asked that the court instruct: "FDA standards and regulations are only minimal in nature and do not establish the standard of care for a reasonable manufacturing company under the circumstances of this case. It is not a defense to a claim that a product is defective that the manufacturer built the product in accordance with government standards or specifications." Appellants also requested that the court give the following instruction: "Even if a manufacturer of over the counter products literally complies with FDA regulations, it is not immune from liability under the laws of the State of California for injuries caused by its products."

The court refused these instructions, and instead instructed: "FDA action or inaction, though not dispositive, may be considered to show whether a product is safe or not safe." Appellants claim this instruction failed to inform the jury that government standards were not relevant to the design defect claim. This is not an accurate statement of the law.

In *Ramirez v. Plough, Inc.* (1993) 6 Cal.4th 539 [25 Cal.Rptr.2d 97, 863 P.2d 167], the plaintiff sued a drug manufacturer, alleging that he contracted Reye's syndrome as a result of ingesting St. Joseph Aspirin for Children, manufactured by defendant. He asserted two theories for products liability: failure to warn based on lack of a Spanish-language warning, and failure to withdraw the product from the market. As to the lack of a Spanish-language warning, defendant argued that the standard of care for packaging and labeling nonprescription drugs, including the necessity of including foreign language labels or package warnings, "has been appropriately fixed by the dense layer of state and federal statutes and regulations that control virtually all aspects of the marketing of its products." (*Id.* at p. 548.) While noting that

---

Cal.Rptr. 412, 751 P.2d 470] precluding design defect claims for prescription drugs to preclude liability on that theory for nonprescription drugs. The trial court denied summary judgment on that claim.

"[c]ourts have generally not looked with favor upon the use of statutory compliance as a defense to tort liability . . . ," the Supreme Court acknowledged there is room for such a defense where the evidence shows only the ordinary situation contemplated by the statute or administrative rule. (*Id.* at pp. 547–548.)

After a lengthy review of the regulatory process governing the labeling of nonprescription drugs, the Supreme Court observed that state and federal legislative and administrative bodies, including the FDA, are able and willing to define the circumstances under which foreign language communications should be mandated. (*Ramirez v. Plough, Inc., supra,* 6 Cal.4th at pp. 550–553.) The court concluded "that the prudent course is to adopt for tort purposes the existing legislative and administrative standard of care on this issue. The feasibility and advisability of foreign-language labeling for nonprescription drugs will, no doubt, be reviewed periodically by the FDA and other concerned agencies. Indeed, we are conscious that our decision here may prompt review . . . by the California Legislature. That is as it should be, for further study might persuade the Legislature, the FDA, or any other concerned agency to revise the controlling statutes [and] regulations for nonprescription drugs." (*Id.* at p. 553.)

*Ramirez* is known primarily for this holding as to foreign-language labeling. But the court also rejected plaintiff's alternative ground for product liability, that defendant should not have marketed the children's aspirin at all because the risks of Reye's syndrome outweighed any benefit to be derived from the product, particularly in light of the availability of nonaspirin pain relievers. (See *Barker v. Lull Engineering Co.* (1978) 20 Cal.3d 413, 431–432 [143 Cal.Rptr. 225, 573 P.2d 443].) The court held, as a matter of law, "that defendant may not be held liable for failing to withdraw its product from the market in early 1986, when plaintiff's mother purchased and used it. (Defendant did cease distribution of [the product] effective December 31, 1986.) Although devastating, Reye's syndrome was then and remains now a rare and poorly understood illness. A few scientific studies had shown an association between aspirin and Reye's syndrome, but the methodology of those studies had been questioned and the FDA had determined that further studies were needed to confirm or disprove the association. Pending completion of those studies, the FDA concluded that product warnings were an adequate public safety measure. Although the FDA's conclusion is not binding on us, we think it deserves serious consideration. Plaintiff has submitted nothing that causes us to doubt the FDA's judgment in this matter that in early 1986 aspirin could be considered a reasonably safe product for administration to children, when distributed with appropriate warnings." (*Ramirez v. Plough, supra,* 6 Cal.4th at p. 556.)

The trial court properly incorporated the essence of this holding when it instructed the jury that "F.D.A. action or inaction, though not dispositive, may be considered to show whether a product is safe or not safe."

Appellants disagree, relying on *McLaughlin v. Sikorsky Aircraft* (1983) 148 Cal.App.3d 203 [195 Cal.Rptr. 764]. In *McLaughlin*, two members of the military were injured when their Navy helicopter crashed. They sued the manufacturer, which had built the helicopter to Navy specifications, alleging strict liability based on defective design. Before trial, the plaintiffs obtained a ruling that "compliance with owner specifications is not a defense to claims of strict liability in tort." (*Id.* at p. 208.) Despite this ruling, and over plaintiffs' objection, the manufacturer presented evidence that it had complied with military specifications in designing the aircraft. The *McLaughlin* court held it was error to allow the jury to consider the military specifications as even a *factor* in determining design defect. (*Id.* at p. 209.)[4]

In light of this damaging evidence, the *McLaughlin* plaintiffs proffered, and the court refused, the following instruction: " 'It is not a defense to a claim that a product is defective that the manufacturer built the product, in this case the helicopter, in accordance with government standards or specifi- cations.' " (*McLaughlin v. Sikorsky Aircraft, supra,* 148 Cal.App.3d at p. 209.) The court held this, too, was error: "Had the court precluded all evidence of government specifications, plaintiffs' proffered instruction may not have been warranted. However, because the court allowed evidence of military specifications on the issue of whether the aircraft was defective, plaintiffs' instruction was essential to the jury's understanding of strict product liability." (*Ibid.*) Defendant's counsel had argued, in spite of the court's in limine ruling, that defendant complied with Navy specifications in designing the aircraft, and that this was a factor showing the product was not defective. The court held that without a proper instruction, the jury was given the erroneous impression that defendant's following of government plans and specifications was evidence there was no defect in the product. (*Ibid.*)

█ We find the holding in *McLaughlin* inapplicable because it is based on an entirely different factual scenario. The governmental entity—the Navy—was the *owner* for whom the helicopters were being manufactured. It furnished the specifications to the defendant, a government contractor, to have the helicopters built according to its plans. The government was not

---

[4] There were two major issues in *McLaughlin*—the availability of a design defect defense to a manufacturer following an owner's specifications, and the availability of immunity to a government contractor. The United States Supreme Court has since severely limited liability of military contractors for design defects where the product was prepared in accordance with the government's precise specifications. (See *Boyle v. United Technologies Corp.* (1988) 487 U.S. 500, 511–512 [101 L.Ed.2d 442, 108 S.Ct. 2510].)

acting as a regulatory body in providing helicopter specifications to the manufacturer. In contrast, the government agency in our case, the FDA, is the regulatory body charged with protecting the public health by ensuring that drugs are safe and effective. (21 U.S.C. § 393(b)(2); *FDA v. Brown & Williamson Tobacco Corp.* (2000) 529 U.S. 120, 134 [146 L.Ed.2d 121, 120 S.Ct. 1291].) While the FDA's standards and decisions do not immunize a drug manufacturer from liability, they are nevertheless entitled to "serious consideration" on the issue of the safety of PPA at the time of appellants' injuries. (See *Ramirez v. Plough, Inc., supra,* 6 Cal.4th at p. 556.)

Appellants argue the court's refusal to give their requested instructions on consideration of FDA standards and actions with respect to their design defect claims was even more prejudicial because of instructions given on their other theory of strict liability, failure to warn.[5] The court instructed: "FDA action or inaction, though not dispositive, may be considered to show whether a risk was known or reasonably scientifically knowable. [¶] Mere compliance with regulations or directives as to warnings, such as those issued by the United States Food and Drug Administration may not be sufficient to immunize the manufacturer of the drug from liability. The warnings required by such agencies may be only minimal in nature and when the manufacturer knows of, or has reason to know of, greater dangers not included in the warning, its duty to warn may not be fulfilled."

■ Contrary to appellants' claim, these instructions did no harm to their design defect claim. They highlighted the limited effect compliance with FDA regulations has on a manufacturer's duty to warn of known or knowable dangers. But they did not suggest that FDA regulations set the standard for determining whether there was a design defect.

We find no instructional error.

## II

Appellants claim the court committed prejudicial error by permitting Novartis to challenge the validity of the Yale Study with scientific evidence that did not meet the admissibility standards established in *People v. Kelly, supra,* 17 Cal.3d 24, 30–31. They argue that in asserting that some of the cases in the Yale Study were misclassified, Novartis was improperly permitted to "hack[] at the A cell" by looking for errors only on the risk side of the

---

[5] A drug manufacturer may be found strictly liable for failure to warn if it failed to give adequate warning of dangers that were "known or knowable in light of the generally recognized and prevailing best scientific and medical knowledge available at the time of manufacture and distribution." (*Anderson v. Owens-Corning Fiberglas Corp.* (1991) 53 Cal.3d 987, 1002 [281 Cal.Rptr. 528, 810 P.2d 549], fn. omitted.)

study—in the group of cases classified as exposed to PPA—rather than following proper methodology by reviewing both exposed and control cases.[6]

■ *People v. Kelly* sets out the standards in California[7] for admission of expert testimony based upon the application of a new scientific technique: "(1) the reliability of the method must be established, usually by expert testimony, and (2) the witness furnishing such testimony must be properly qualified as an expert to give an opinion on the subject. [Citations.] Additionally, the proponent of the evidence must demonstrate that correct scientific procedures were used in the particular case." (*People v. Kelly, supra,* 17 Cal.3d at p. 30, italics omitted.)

Appellants' argument is focused on the testimony of two of Novartis's experts, Dr. Mark Alberts and Dr. Donald Goldmann.[8] Both experts testified about the proper methodology for a case control study, and described certain aspects of the Yale Study which in their opinion deviated from that methodology. Among their concerns was the possibility that three of the cases were misclassified, which would have had a significant impact on the study's results, given the very small number of cases in the subgroup upon which the study's conclusions were based.[9] Dr. Alberts testified that in one case, the records indicated the focal time[10] for the stroke preceded the patient's use of the PPA-containing product. Dr. Goldmann testified that the reclassification of that case from unexposed to exposed during the course of the study was

---

[6] In their motion in limine seeking to exclude this evidence, appellants argued: "Looking for errors only among the subset or 'cell' of cases classified as exposed to PPA prior to the stroke has been labeled by epidemiologists as 'hacking at the A cell': looking for errors only in the one group (or cell) that is irritating. . . . Here, an exposed case (the A cell) irritates the defendants, because if PPA exposure in the A cell is greater than PPA exposure in the control group, it produces an elevated 'odds ratio' or relative risk. There are other case and control 'cells' that would have to be examined for misclassification error for the review to be scientifically valid. However, none of the defense experts reviewed all or even a random sampling of the various 'cells.' Instead they (or some defense lawyer) just 'hacked at the A cell,' where, if they found an error, it would help them. Accordingly, even if a misclassification were identified, it would not be scientifically meaningful absent a review of all cells in an even-handed way."

[7] California has not adopted the standards for admissibility of scientific evidence established by the United States Supreme Court in *Daubert v. Merrell Dow Pharmaceuticals, Inc.* (1993) 509 U.S. 579 [125 L.Ed.2d 469, 113 S.Ct. 2786]. (*People v. Leahy* (1994) 8 Cal.4th 587, 593–604 [34 Cal.Rptr.2d 663, 882 P.2d 321].) *Daubert v. Merrell Dow Pharmaceuticals, Inc.* (9th Cir. 1995) 43 F.3d 1311, in which the Ninth Circuit addressed the procedure federal judges should follow in ruling on the admissibility of expert scientific testimony following the Supreme Court's *Daubert* decision, is not helpful. Nor is it binding on this court. (See *People v. Williams* (1997) 16 Cal.4th 153, 190 [66 Cal.Rptr.2d 123, 940 P.2d 710].)

[8] Appellants do not claim these witnesses were unqualified to testify as experts.

[9] Of the total number of women in the study, 383 had a hemorrhagic stroke, with 750 in the control group. Only seven of the 383 stroke patients and only four of the 750 controls were categorized as first use of PPA.

[10] Focal time was described as the time when the stroke first started.

inconsistent with the proper conduct of a case control study. He and Dr. Alberts both testified that under the protocol for the study, a second case should have been excluded because the patient had a preexisting history of transient ischemic attacks. In his opinion, the case should have been submitted to an impartial panel to decide whether to include it. There also was an issue about whether that patient had been exposed to PPA because she initially stated she had taken Sudafed, not Tavist-D. The witnesses also testified that a third case was possibly misclassified.

■ The *Kelly* rule " 'tests the fundamental validity of a new scientific methodology, not the degree of professionalism with which it is applied. [Citation.] Careless testing affects the weight of the evidence and not its admissibility, and must be attacked on cross-examination or by other expert testimony.' " (*People v. Cooper* (1991) 53 Cal.3d 771, 814 [281 Cal.Rptr. 90, 809 P.2d 865].) Novartis's evidence that some cases in the Yale Study were misclassified was not based on new scientific methodology; it was a challenge to the professionalism with which the methodology was applied. The *Kelly* standards for admission of new scientific methods do not apply. We find no error in the court's admission of this evidence.

We also find no undue prejudice from admission of this evidence. Appellants were not taken by surprise by the testimony of these experts; Novartis timely disclosed its intent to rely on their experts' opinions criticizing the Yale Study, including identification of specific cases that may have been misclassified. Novartis also provided deposition designations of its experts, which included portions questioning the methodology used in the Yale Study. In response to appellants' request to exclude this evidence under Evidence Code section 352, as unduly time consuming and highly prejudicial, the court found the evidence too probative to exclude, but gave appellants additional time so that they could adequately address the criticism of the Yale Study.

Appellants subjected these experts to extensive cross-examination about their critiques of the Yale Study. Through their cross-examination, appellants addressed each of the criticisms the experts had about the study, including the claim that cases were misclassified. (For example, appellants inquired whether the experts had looked at all the cases in the controls, as well as the exposed cases. The experts admitted they had not.)

In their case-in-chief, appellants presented testimony by one of the coauthors of the Yale Study, Dr. Edward Feldmann. He testified that the PPA manufacturers "were involved in every aspect of the design, all along, in the decision to perform the study in aspects of the study design, certainly representatives of the pharmaceutical industry were at all the meetings and they watched us conduct the study as we did the entire thing." Asked whether

there was any oversight for the conduct of the study, Dr. Feldmann explained that the FDA watched the entire study being conducted, and there also was a group of scientists called the "Scientific Advisory Group" that was responsible for supervising the conduct of the trial. The purpose of the advisory group was to oversee the trial to make sure that its design and execution were consistent with the goals of the trial and that it was proceeding as planned. Dr. Feldmann explicitly addressed the bases on which stroke patients were included or excluded from the study: "Not everybody that reported use of P.P.A. was included in the analysis because we—the study made an effort to rigorously define the use of the drug and not count everybody who just mentioned and proved exposure to P.P.A. And so there are a number of both cases and controls who don't appear in the analysis, despite the fact that they said that they used P.P.A. And that's perhaps the timing of P.P.A. use, just didn't meet the definitions that we had to include them into the trial."

Appellants were given a full opportunity to put before the jury the strength and legitimacy of the methodology used in the Yale Study and to rebut the defense experts' criticisms of the study. There was neither error nor undue prejudice in the admission of this evidence.

### III

Appellants claim the trial court "erroneously allowed Novartis to present massive FDA evidence" while limiting appellants' FDA evidence and restricting their use of that evidence to cross-examination and rebuttal.

It is apparent from the record that both sides in this litigation recognized the relevance of evidence of the FDA's review of PPA products; they both sought introduction of FDA evidence favorable to their position, and sought to exclude FDA evidence that could be harmful. For example, appellants objected to Novartis's use of FDA evidence to show that the FDA allowed products containing PPA to be legally marketed and did not order them removed from the market until long after appellants suffered their strokes. But appellants relied on the fact that the FDA deferred action on categorizing PPA cough and cold products as safe and effective, pending the results of the Yale Study. They relied heavily on the results of that study, and on the FDA's action in asking the manufacturers to withdraw PPA products from the market in light of the Yale Study.

The record demonstrates that the trial court carefully considered admission of each piece of FDA evidence, whether proffered by appellants or Novartis. There is no indication that, as appellants claim, the court gave Novartis "unfettered discretion about what FDA evidence to introduce and argue."

Nor do we find that appellants faced unfair limitations on their ability to present FDA-related evidence. They were precluded from obtaining the testimony of any officer or employee of the FDA by 21 Code of Federal Regulations part 20.1(a) (2006), which provides: "No officer or employee of the Food and Drug Administration . . . shall give any testimony before any tribunal pertaining to any function of the Food and Drug Administration or with respect to any information acquired in the discharge of his official duties." Novartis also was limited by this regulation. As the court instructed the jury, the regulation "doesn't count against either side, that's just your federal government and a rule that happens to be in effect."

Appellants do not actually claim they were prevented from introducing FDA evidence at all; they argue that the court refused to allow them to refer to that evidence during opening statement or in their case-in-chief. We find no unreasonable restriction.

In opening, appellants' counsel argued: "The FDA evidence you'll hear is this, that this product was what they called grandfathered by the FDA. It was on the market in the early 1900's, and it stayed on the market—PPA stayed on the market and was grandfathered in. In other words, they got a free pass as to safety, and you'll hear evidence that the FDA never tested PPA." Counsel proceeded to give a timeline, explaining the FDA "never found PPA was safe. That's the evidence in this case. And all they did. They kept deferring ruling, and you're going to hear why they deferred ruling. You're going to also hear evidence that that over-the-counter division was over-worked according to the documents from Novartis, the defendants' documents, that they were overworked and understaffed, inexperienced, that division. But, remember, the FDA is not on trial here. Under California law Novartis is the one that has the responsibility and the duty to provide safety of the drug that they—that they make, that they label, that they market, sell and profit from. The FDA does none of those things so under our law we believe Novartis is liable."

Counsel then described the history of PPA's monograph study, including the increasing concerns of the FDA and its deferral of action. Counsel argued that political pressure was placed on the FDA to "back off" from labeling PPA as unsafe. Counsel described the mounting evidence of injury from PPA and the FDA's delay in acting on it pending results of the Yale Study. Counsel argued that instead of accepting the study and taking the drug off the market, Novartis hired experts to attack the Yale results. "You're going to see them do that in this courtroom, try and undercut the Yale results, but you're going to hear from the Yale people saying, 'No, this is a good study; the FDA says it's a good study,' and they pressured Yale not to release the preliminary data to the FDA." According to counsel, after a seven-month delay, the Yale

Study was given to the FDA. The FDA committee concluded that the study showed an association between PPA use and increased risk of hemorrhagic stroke, and issued a withdrawal of approval.

Another of appellants' attorneys described the FDA's role in greater detail. He explained that FDA regulations are only minimum standards. He reviewed the history of PPA and the FDA's monograph process for older drugs such as PPA. Counsel displayed a chronology prepared by an FDA staff member, and explained that the FDA produced only some documents, withholding others under claim of privilege. He stated that a statute prohibits both sides from taking the depositions of FDA staff members; "I wish we could have testimony from those folks as to what was going on. We have to get by on the documents that we do have." At this point, the court informed the jury that the restriction on FDA testimony is a federal rule that "doesn't work for or against anybody in this case. That's a fact we have to live with."

Counsel proceeded to review the chronology of PPA review set out in the FDA document, and then presented "[t]he bottom line"—"Consumers could buy P.P.A. even though the F.D.A. never found it to be safe, because of the marketing loophole and F.D.A. regulations and Pearl O'Neill and Linda Lutz and other consumers around the country never knew that P.P.A. had never been officially found safe by the F.D.A." These excerpts demonstrate that appellants faced no unreasonable restriction in addressing FDA evidence during their opening.

Appellants also presented detailed evidence about the workings of the FDA in their case-in-chief. This included the deposition testimony of James Parker, a doctor of pharmaceutical chemistry who worked for many years in the regulatory affairs department of a pharmaceutical company. In the course of his work, Dr. Parker became familiar with the FDA's practices and procedures, and later taught food and drug law at Boston College School of Law. He had been a consultant in the area of FDA law and regulation for pharmaceutical products since 1990. Dr. Parker testified about the history and purpose of the FDA. He described the agency's monograph process for examining the safety and effectiveness of over-the-counter pharmaceuticals which already were on the market, and described the process of approval of new drug applications. He also testified about the FDA's labeling regulations and explained the different standards for warnings on prescription and nonprescription drugs. After giving this background on the FDA procedures, Dr. Parker testified more specifically about the monograph review history of PPA. He gave extensive testimony about the FDA's consideration and conclusions with regard to PPA.

Appellants presented the deposition testimony of Dr. Jerry Avorn, a physician, associate professor of medicine, and chief of the division of

pharmacoepidemiology and pharmacoeconomics at one of the main teaching hospitals at Harvard Medical School. Dr. Avorn testified about the purpose and protocol of the Yale Study, and explained the content of the final report. He then testified about the FDA's response to the Yale Study.

Through counsels' opening statements, through their own witnesses, and through cross-examination of Novartis's witnesses, appellants had a full opportunity to present FDA evidence to support their case and to rebut Novartis's efforts to utilize FDA evidence as a defense. We find no unreasonable restriction in appellants' ability to present their evidence.

## IV

Appellants claim the court improperly excluded six specific items of evidence. The first is a document labeled "Project Team Meeting Minutes." This exhibit contained "the combined minutes of two Project Team Meetings" and were signed by Gregory M. Torre, "Director, Drug Registration & Regulatory Affairs" for Sandoz, one of Novartis's predecessors. (See fn. 1, *ante*.) The minutes were prepared on May 15, 1990, and reported the meetings of January 29, 1990, and March 20, 1990.

Novartis did not challenge the authenticity of these minutes (which came from its own files), but argued that the document did not satisfy Evidence Code section 1271, the business records exception to the hearsay rule, because it was not prepared at or near the time of the meetings. The court agreed.

Appellants then argued that the evidence was admissible as a party admission, based on the portion of the minutes discussing the FDA monograph status of PPA. The pertinent paragraph states: "Tavist D. was originally approved with the safety and efficacy of its PPA component having been assumed by PPAs consideration in the Cough/Cold OTC Products-Oral Nasal Decongestant—Tentative Final Monograph. At the time of the TFM the safety of PPA was called into question and it was proposed by the FDA that the issue would be definitively addressed by the time a Final Monograph was issued. To date, the Monograph has not been finalized. The safety of PPA remains in Regulatory limbo."

Appellants explained that Novartis consistently had taken the position that when Tavist-D was first approved by the FDA, the FDA passed on the safety of PPA. They argued that the minutes constituted an admission by Novartis, through its employee, that the FDA's approval of Tavist-D was *not* a determination that PPA was safe.

■ Evidence Code section 1222 sets out the hearsay exception for an authorized admission: "Evidence of a statement offered against a party is not made inadmissible by the hearsay rule if: [¶] (a) The statement was made by a person authorized by the party to make a statement or statements for him concerning the subject matter of the statement; and [¶] (b) The evidence is offered either after admission of evidence sufficient to sustain a finding of such authority or, in the court's discretion as to the order of proof, subject to the admission of such evidence." For purposes of this exception, the authority of a declarant employee to make a statement for an employer can be implied as well as express. (*O'Mary v. Mitsubishi Electronics America, Inc.* (1997) 59 Cal.App.4th 563, 570 [69 Cal.Rptr.2d 389].) The determination generally "requires an examination of the nature of the employee's usual and customary authority, the nature of the statement in relation to that authority, and the particular relevance or purpose of the statement." (*Ibid.*)

Appellants presented no evidence of Dr. Torre's authority to make a statement on behalf of the company. They relied on his title, director of regulatory affairs. Although place in an employer's hierarchy is important in determining authority to speak, Dr. Torre's title, without more, is not sufficient to show he had authority to make admissions on behalf of a company. (See *O'Mary v. Mitsubishi Electronics America, Inc., supra*, 59 Cal.App.4th at p. 572 [mere fact declarant was a vice-president does not automatically confer authority to make admissions on behalf of company].) In the absence of the necessary foundation for an authorized admission, the court properly excluded this evidence.

Appellants next claim error in the court's exclusion of testimony of two experts from an unrelated case involving Parlodel, a medication manufactured by Novartis.[11] Parlodel was associated with strokes and intracerebral hemorrhages in postpartum women, resulting in lawsuits against Novartis. Novartis moved in limine to exclude testimony by two of its experts in a Parlodel lawsuit, *Soldo v. Sandoz Pharmaceuticals Corp.* (W.D.Pa. 2003) 244 F.Supp.2d 434, filed in the United States District Court for the Western District of Pennsylvania.

According to appellants, Dr. Stanley Cohan and Dr. Sheila Buchbinder testified in depositions in the *Soldo* case that PPA can cause strokes, and gave their expert opinion that PPA was a cause of stroke in a young woman who was taking both Parlodel and a product containing PPA.

Evidence Code section 1292 governs the admissibility of former testimony given in another case, and provides: "(a) Evidence of former testimony is not

[11] The suit was against Novartis Pharmaceuticals, a sister corporation to Novartis Consumer Health, the primary defendant in this case.

made inadmissible by the hearsay rule if: [¶] (1) The declarant is unavailable as a witness; [¶] (2) The former testimony is offered in a civil action; and [¶] (3) The issue is such that the party to the action or proceeding in which the former testimony was given had the right and opportunity to cross-examine the declarant with an interest and motive similar to that which the party against whom the testimony is offered has at the hearing."

■ Appellants did not show that the experts were unavailable as witnesses. Nor was there a showing that Novartis had a similar interest and motive in examining the experts in the *Soldo* case and in this one. "[S]imilarity of interest and motive must be determined *on practical considerations*, not merely the similar position of the parties in the two cases." (*Gatton v. A.P. Green Services, Inc.* (1998) 64 Cal.App.4th 688, 692 [75 Cal.Rptr.2d 523].) In *Soldo*, Novartis was interested in pointing to causes of stroke other than the plaintiff's ingestion of Parlodel; expert testimony implicating PPA as a possible cause of the stroke would thus have been helpful in the *Soldo* case, but potentially harmful in this one. The evidence did not meet the requirements for the former testimony exception to the hearsay rule.

■ Appellants also argued the evidence was admissible as an authorized admission, under Evidence Code section 1222. They presented no evidence that the experts were authorized agents of Novartis on the subject of PPA causing strokes. The fact that they were retained by Novartis in the *Soldo* case does not automatically establish the necessary agency relationship. As the court explained in *Kirk v. Raymark Industries, Inc.* (3d Cir. 1995) 61 F.3d 147, 164, "In theory, despite the fact that one party retained and paid for the services of an expert witness, expert witnesses are supposed to testify impartially in the sphere of their expertise. . . . Since an expert witness is not subject to the control of the party opponent with respect to consultation and testimony he or she is hired to give, the expert witness cannot be deemed an agent."

The court excluded this evidence under Evidence Code section 352, as more prejudicial than probative. Appellants wanted the evidence admitted to show that Novartis had notice of PPA's tendency to cause strokes, and acted with conscious disregard by ignoring that information. The expert testimony in the *Soldo* case was given after the time of appellants' strokes, so its probative value on notice was very limited. The court found the evidence was likely to confuse the jury, and would "lead us down through a lot of collateral issues." To the extent the experts relied on studies that preceded appellants' strokes, the underlying studies were admitted, so the prior testimony would have been cumulative. For all these reasons, we find no abuse of discretion in the court's exclusion of this evidence.

Next, appellants claim the court should have taken judicial notice of the denial of summary judgment in *Glaser v. Thompson Medical Co., Inc.* (6th Cir. 1994) 32 F.3d 969. This decision, they argue, "provided compelling evidence that there was sufficient scientific evidence of ponderable significance to justify requiring stroke warnings on PPA products before these plaintiffs' strokes and/or that the products should have been reformulated with PSE." Court records may be the subject of judicial notice under Evidence Code section 452, subdivision (d), but that is not what appellants were seeking. They wanted judicial notice of the *Glaser* decision, for purposes of relying on the court's factual determination. A court may take judicial notice of a court's action, but may not use it to prove the truth of the facts found and recited. (*Kilroy v. State of California* (2004) 119 Cal.App.4th 140, 145 [14 Cal.Rptr.3d 109]; see also *Sosinsky v. Grant* (1992) 6 Cal.App.4th 1548, 1564–1569 [8 Cal.Rptr.2d 552].) The court properly refused to take judicial notice of the *Glaser* decision.

Appellants claim the court erred in excluding the testimony of Dr. Avorn that pulling PPA from the market was politically impossible. They fail to present legal argument to support this claim. Whether or not the evidence was properly excluded, appellants suffered no prejudice. They were permitted to introduce other evidence to make this same point, including letters from New York Senator Alfonse D'Amato to the Secretary of Health and Human Services. In 1981, writing on behalf of a New York vendor of weight control drugs, Senator D'Amato expressed concern that the FDA was planning to release a 1979 report on the safety and effectiveness of PPA which would prejudice the use of PPA or otherwise negate positive conclusions which were contained in the 1979 study. He specifically requested "that before the FDA takes any action with respect to the report that you insure the weight control industry's point of view is given the full consideration it deserves." In a 1984 letter to the Secretary of the Department of Health and Human Services, Senator D'Amato expressed concern that the FDA was proposing reclassification of PPA from category 1 status, safe and effective, to category 3. "This proposed downgrading is based on questionable scientific evidence of foreign origin and if approved would have a devastating impact on a number of my constituents in terms of lost jobs." Appellants had the opportunity to show, and to argue, that political pressure delayed the FDA's action on the classification of PPA.

Appellants claim the court improperly refused to admit evidence of the FDA analysis on additional adverse event reports. As Novartis points out, the September 27, 2000 memorandum was admitted into evidence.

Finally, appellants claim the court erred in excluding evidence that Novartis did not report adverse events to the FDA. They give us no indication of the

basis for the court's ruling, and present no legal argument with regard to that ruling. We deem the issue abandoned.

In this lengthy and complex trial, the trial court carefully and properly exercised its discretion in the admission and exclusion of evidence.

## DISPOSITION

The judgment is affirmed. Respondent is to have its costs on appeal.

Willhite, J., and Manella, J., concurred.

Appellants' petition for review by the Supreme Court was denied June 13, 2007, S151382.