Filed 2/14/14 (unmodified opinion attached)

**CERTIFIED FOR PUBLICATION**


IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT


| | |
|---|---|
| CAROL CHEAL,<br><br>　　　Plaintiff and Appellant,<br><br>　　　　　v.<br><br>EL CAMINO HOSPITAL,<br><br>　　　Defendant and Respondent. | H036548<br>(Santa Clara County<br>Super. Ct. No. CV141348)<br><br><br>**ORDER MODIFYING OPINION**<br><br>**NO CHANGE IN JUDGMENT** |


THE COURT:

It is ordered that the opinion filed herein on January 31, 2014, be modified as follows:

1. On page 1, in the caption line three, the number "CV14348" is changed to "CV141348" so the line reads:

   Super. Ct. No. CV141348


There is no change in the judgment.

Dated: _____

RUSHING, P.J.

WE CONCUR:


_____

ELIA, J.


_____

GROVER, J.

Filed 1/31/14 (unmodified version)

**CERTIFIED FOR PUBLICATION**


IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT


| | |
|---|---|
| CAROL CHEAL, | H036548 |
| Plaintiff and Appellant, | (Santa Clara County Super. Ct. No. CV14348) |
| v. | |
| EL CAMINO HOSPITAL, | |
| Defendant and Respondent. | |


Plaintiff Carol Cheal brought this action for age discrimination against her former employer, defendant El Camino Hospital. Defendant successfully prevailed upon the trial court to grant summary judgment in its favor despite numerous materially disputed facts. As too often happens, the merits of the case were obscured to the point of invisibility in the deluge of statements, counter-statements and objections, that mark modern summary judgment practice. The record clearly raises triable issues of fact with respect to whether plaintiff was performing adequately at the time of her discharge and whether the discharge was the product of a belief to the contrary or of discriminatory animus against older workers on the part of plaintiff's immediate supervisor. We will therefore reverse the judgment.

**BACKGROUND**

Plaintiff worked in defendant's Nutrition Services Department from August 1987 until her discharge in October 2008 at age 61. At all relevant times she held the position of Dietetic Technician Registered, or "Diet Tech." For present purposes it may be

assumed, as defendant asserts, that her duties were the same as those of a "menu clerk" or "Diet Clerk[]." They involved the preparation of menus for patient meals, while adhering to procedures intended to ensure that the correct foods reached the correct patients.

Up to and including her performance evaluation in August 2007, plaintiff always received a rating of "Meets Standards," which she declared without contradiction was "the highest category of performance on the Hospital's 'Performance Evaluation.' " But things changed after July 2007, when defendant hired Kim Bandelier to supervise all employees on the clinical side of nutritional services, including plaintiff. By January 2008, Bandelier was accusing plaintiff of numerous shortcomings. On April 14, 2008, Bandelier gave plaintiff a written warning for failure to conform to the hospital's "two-patient identifier procedure," discussed in more detail below (see pt. II(E)(2), *post*). On June 3 she issued a second, "[f]inal" warning for failure to comply with the same procedure.

On Monday, September 8, 2008, Bandelier accused plaintiff of incorrectly preparing one or more menus for a patient restricted to "pudding thick" liquids, in a manner that allowed, or could have allowed, the patient to receive thinner, "honey thick" liquids. On September 25, 2008, a hospital manager told plaintiff that she was no longer considered competent to perform her duties as a diet clerk or diet tech, and that she could either take another position in the nutrition services department, accept a severance package, or be discharged. About a week later, plaintiff informed defendant that any further communication should go through her attorney. On October 10, 2008, defendant notified plaintiff that her employment was terminated.

Plaintiff filed this action on April 30, 2009, asserting causes of action for age discrimination, wrongful demotion and termination, failure to investigate or take corrective action against age discrimination, and retaliation for complaints of unlawful discrimination. Defendant answered with a general denial and 14 affirmative defenses.

2

On August 13, 2010, defendant filed a motion for summary judgment, asserting 77 supposedly undisputed facts in support. Plaintiff responded to each of these assertions and submitted 37 additional facts that she contended precluded summary judgment. Each party lodged numerous objections to the evidence put forth by the opposing party. The court issued an order sustaining some objections, overruling the rest, and granting the motion for summary judgment. The court wrote that summary judgment was warranted because (1) "[p]laintiff fail[ed] to show she performed her job in a satisfactory manner"; (2) defendant "establishe[d] a legitimate, nondiscriminatory reason for its actions" while "[p]laintiff . . . [did] not produce *substantial evidence* that Defendant's stated reasons were untrue or pretextual, or that Defendant acted with a discriminatory animus" (italics in original); (3) having failed to make a prima facie case of age discrimination, plaintiff could not establish her claims for wrongful termination and failure to investigate or take corrective action; and (4) because plaintiff had already been "disciplined on numerous occasions" when she first complained, plaintiff could not make out a cause of action for unlawful retaliation.

Plaintiff filed this timely appeal.

## DISCUSSION

### I. General Principles

" 'We summarized the principles governing an appeal of this type in *Reeves v. Safeway Stores* (2004) 121 Cal.App.4th 95, 106–107 [16 Cal.Rptr.3d 717] (*Reeves*): "On appeal from an order granting summary judgment 'we must independently examine the record to determine whether triable issues of material fact exist. [Citations.]' [Citation.] The question is whether defendant ' " 'conclusively negated a necessary element of the plaintiff's case or demonstrated that under no hypothesis is there a material issue of fact that requires the process of trial.' [Citation.]" [Citation.]' [Citations]; (see *Guz v. Bechtel National Inc.* (2000) 24 Cal.4th 317, 335, fn. 7 [100 Cal.Rptr.2d 352, 8 P.3d

3

1089], . . . (*Guz*) ['the issue . . . is simply whether, and to what extent, the evidence submitted for and against the motion . . . discloses issues warranting a trial'].) . . . [Citation.] Moreover, 'we must view the evidence in a light favorable to plaintiff as the losing party [citation], liberally construing [his] evidentiary submission while strictly scrutinizing defendants' own showing, and resolving any evidentiary doubts or ambiguities in plaintiff's favor. [Citations.]' [Citations.] And a plaintiff resisting a motion for summary judgment bears no burden to establish any element of his or her case unless and until the defendant presents evidence either affirmatively *negating* that element (proving its absence in fact), or affirmatively showing that the plaintiff does not possess and cannot acquire evidence to prove its existence. [Citations.]" ' (*Mamou v. Trendwest Resorts* (2008) 165 Cal.App.4th 686, 710-711, 81 Cal.Rptr.3d 406 (*Mamou*).) In determining whether a triable issue was raised or dispelled, we must disregard any evidence to which a sound objection was made in the trial court, but must consider any evidence to which no objection, or an unsound objection, was made. (See *Reid v. Google* [(2010)] 50 Cal.4th 512, 534, 113 Cal.Rptr.3d 327, 235 P.3d 988; Code of Civ. Proc., § 437c, subds. (b)(5), (c), (d).) Such evidentiary questions, however, are subject to the overarching principle that the proponent's submissions are scrutinized strictly, while the opponent's are viewed liberally.' " (*McCaskey v. California State Auto. Assn.* (2010) 189 Cal.App.4th 947, 956-957.)

## II. Unsatisfactory Performance

### A. Introduction

The first and primary ground cited by the trial court for its entry of summary judgment was this: "As Plaintiff made several mistakes on menus between January and May in 2008, Plaintiff fails to show she performed her job in a satisfactory manner." Competent performance is part of a plaintiff's "prima facie case of discrimination" (*Guz*, *supra*, 24 Cal.4th at p. 354) under the special burden-shifting analysis devised in

4

*McDonnell Douglas Corp. v. Green* (1973) 411 U.S. 792, 802-804 (*McDonnell Douglas*).

Under that approach, an employment discrimination plaintiff raises a presumption of

liability by "provid[ing] evidence that (1) he was a member of a protected class, (2) he

was . . . performing competently in the position he held, (3) he suffered an adverse

employment action, such as termination, demotion, or denial of an available job, and

(4) some other circumstance suggests discriminatory motive. [Citations.]" (*Guz*, *supra*,

at p. 355.)

The trial court thus ruled that plaintiff would be unable at trial to establish the

second factor, i.e., that she was "performing competently in the position [s]he held."[1]

This contention necessarily implicates two constituent questions: What could a trier of

fact find to be a competent level of performance; and what level of performance did the

plaintiff actually render? We turn now to those questions.

### B. Standard of Competent Performance

What constitutes satisfactory performance is of course a question ordinarily vested in the

employer's sole discretion. An employer is free to set standards that might appear

unreasonable to outside observers, and to discipline employees who fail to meet those

---

[1] Although it is often convenient to view the evidence in such cases under the lens of *McDonnell Douglas* and *Guz*—and that is the framework within which the issues were framed and decided below—that approach is not mandatory and need not hamstring either the parties or the court. "[W]hen a plaintiff in a discrimination case has direct evidence of discrimination as well as the indirect evidence required to make out a prima facie case under *McDonnell Douglas* he does not have to show that either approach, taken in isolation from the other, makes out a prima facie case—he can combine them. 'Any demonstration strong enough to support a judgment in the plaintiff's favor if the employer remains silent will do, even if the proof does not fit into a set of pigeonholes.' [Citations.] 'Despite the minutiae of the various proof schemes set forth in *McDonnell Douglas* . . . the straightforward question to be answered in discrimination cases is whether the plaintiff has successfully demonstrated that she was the victim of . . . discrimination on the part of the employer.' [Citation.]" (*Simple v. Walgreen Co.* (7th Cir. 2007) 511 F.3d 668, 670-671 (Posner, J.).)

standards, so long as the standards are applied evenhandedly. But that does not mean that an employer conclusively establishes the governing standard of competence in an employment discrimination action merely by asserting that the plaintiff's performance was less than satisfactory. Evidence of the employer's policies and practices, including its treatment of other employees, may support a contention, and an eventual finding, that the plaintiff's job performance did in fact satisfy the employer's own norms. Such a finding not only carries the plaintiff's burden to show competence under the *McDonnell Douglas/Guz* analysis; it also grounds an inference that the true motive for the challenged action lay somewhere else, as in discriminatory animus.

Here the trial court concluded that plaintiff had failed to show competent performance because the evidence showed that she "made several mistakes on menus between January and May in 2008." But aside from triable issues concerning the number and magnitude of the "mistakes" she made (discussed below), there was strong evidence before the court that the hospital, under its own written policies, anticipated and expected such mistakes because, given the nature of the work, they were inevitable. According to plaintiff's uncontradicted account, the hospital prepared about 500 meals a day, which required processing 500 menus. Of these, perhaps a third were "special diets." Each food selected by a patient on a special diet had to be checked against, and modified if necessary to conform to, the physicians' orders for that patient. As a result, plaintiff declared, "errors by all Diet Office staff invariably resulted." For this reason, the hospital relied on a multi-tiered system of safeguards in which "tally clerk[s]" reviewed the work of menu clerks, a "checker" on the kitchen staff compared tray contents to menu entries, and the nurses, who actually delivered the trays to special-diet patients, assumed "the final responsibility for the check of the food tray." This statement is substantiated by a copy of a written policy attached to, and identified in, plaintiff's declaration. It states that upon delivery of a meal tray to the nursing station, "Nursing staff is responsible for

6

immediately confirming the accuracy of each tray by checking the menu heading, room number, name and diet order on each menu, with the most recent diet order for that patient."[2]

Indeed, plaintiff offered something of a smoking gun on this point in the form of the hospital's printed evaluation form for the diet tech position, which prescribed the acceptable rate for certain types of errors. Of seemingly greatest pertinence here is the notation, under "menu writing skills," that the diet tech "uses appropriate food consistencies and compositions in accordance with patient's diet orders and age with *less than one error per day*." (Emphasis added.) Similar notations appear under "meal tray checking skills" ("less than two errors per meal"), "nourishment (NX) checking skills" ("less than one error per day"), and use of "MIS and diet office PC" ("less than one error per day"). These entries alone seem to belie the trial court's rationale, i.e., that "several mistakes on menus" over a period of four or five months precluded a finding that plaintiff had rendered satisfactory performance.

Also bearing on this subject was evidence of the pervasiveness of similar errors by other hospital employees performing similar work. Although neither side attempted to quantify these rates, plaintiff declared with respect to the two patient identifier requirement, violations of which formed the basis for the two written warnings she

---

[2] The trial court sustained relevance and foundational objections both to plaintiff's averments on this subject and to the written policy cited by her. But the evidence was clearly relevant, since the existence of multiple safeguards bears on the inevitability of errors by workers performing plaintiff's duties, and thus the extent to which her job performance met, or fell short of, the standards imposed on those workers by the hospital. As for the objection of insufficient foundation, plaintiff had worked in the hospital's food services department for some 21 years. She was presumably familiar, from her own firsthand professional experience, with its policies and practices, and there is no reason to suppose she was *not* familiar with its written policies. For purposes of summary judgment, her identification of the attachment as "[a] true and correct copy of the Hospital's policy on this matter" must be accepted at face value.

received (see pt. II(C)(2), *post*), "I have personal knowledge that other Diet Staff (diet clerks, menu clerks and tally clerks) had problems with and frequently failed to follow the 'two patient identifier' system as required by Ms. Bandelier.' " Of the five other workers in the department, all but one were under 40 years of age. Plaintiff declared, "When I presented copies of the menu mistakes by these other Diet Staff employees to Ms. Bandelier, she made excuses for these other, younger workers' mistakes. While I received discipline and written warnings for failing to follow the 'two patient identifier' system, to my knowledge no other Diet Clerk was disciplined by way of a written warning for failing to follow the two patient identifier systems."[3]

Much of defendant's evidence seems intended to suggest that the errors attributed to plaintiff were unacceptably grave because they implicated patient safety. No attempt was made, however, to quantify either the number or potential seriousness of mistakes committed by other persons performing duties similar to plaintiff's, or to otherwise identify anything like a quantitative standard to which plaintiff's performance might be compared. The only benchmark suggested by the record is the performance evaluation form, which suggests that errors of the type attributed to plaintiff would be acceptable at

---

[3] Plaintiff also introduced evidence that Bandelier herself said more than once that "we all," referring to everyone in the department, "make[] mistakes." The trial court sustained a hearsay objection to plaintiff's direct averment of this fact—a ruling which appears unsound since the quoted utterances appear to constitute statements on a subject as to which Bandelier was authorized to speak on defendant's behalf to persons under her supervision. (See Evid. Code, § 1222.) In any event the court properly overruled objections, on grounds of relevance and lack of authentication, to the exhibit in which Bandelier's statements were recorded. The document was obviously relevant, and plaintiff adequately authenticated it by identifying it under penalty of perjury as "Ms. Bandelier's Diet Office Meeting notes." Even if more than this were required, the document bears the initials of a "Carol C."—as well as those, apparently, of other meeting attendees—grounding an inference that plaintiff had seen it before. (See Evid. Code, § 1400 ["Authentication of a writing means (a) the introduction of evidence sufficient to sustain a finding that it is the writing that the proponent of the evidence claims it is . . . ."].)

8

a rate of "less than one . . . per day." Defendant has never suggested that plaintiff committed such errors with anything approaching a daily or even weekly frequency. For this reason alone, the trial court's chief rationale for granting summary judgment cannot be sustained.

### C. Plaintiff's Actual Performance

#### 1. "Coachings"

In addition to triable issues over the performance standards governing plaintiff's work, the record presents substantial evidentiary conflicts over the extent to which plaintiff actually committed the "several errors" found by the trial court. Bandelier's declaration and its attachments suggest, by our count, 19 distinct areas or incidents of unsatisfactory performance. Sixteen of these consist of "coachings" Bandelier assertedly "conducted with" plaintiff as recited in an email Bandelier prepared for a supervisor as plaintiff's discharge neared. Bandelier cited the e-mail in her declaration in support of an averment that "[a]lmost immediately upon my arrival, I had to counsel Ms. Cheal on mistakes and patient-safety related problems with her job performance." The intended implication, obviously, is that many of the "coaching" occasions pointed to an instance or area of unsatisfactory performance.

Nearly every item on the e-mailed list, however, was squarely controverted by plaintiff. The first entry, "soiled menus," is manifestly intended to suggest that on the date specified, plaintiff had been guilty of improperly using such menus. Plaintiff flatly denied that she had done so, *and that she had been "coached" for doing so*. She declared, "I was not 'counseled' about using soiled menus . . . because I did not have any soiled menus I was working with. Rather, during a conversation about overtime, Ms. Bandelier simply stated that when there is a soiled menu (e.g. due to a liquid spill, coffee, etc.) a new one should be prepared. This conversation . . . did not relate to any work I was doing that day or recently." In other words, Bandelier had taken an abstract

9

statement she made about best practices, described it as "coaching," and cited it as somehow reflective of unsatisfactory performance.

Another entry referred to a "coaching" in September 2007 for "allowing grapefruit juice on menu," which the e-mail described as a "HUGE no no" and "a patient safety issue." Bandelier's declaration also contains an averment that on an unspecified date, plaintiff "allow[ed] grapefruit juice on a diet for which grapefruit was specifically forbidden." Plaintiff flatly denied that she did any such thing, stating that if a patient had actually received grapefruit juice in violation of a medical restriction, the patient "must have orally requested the juice via the nurse or dietician to the Diet Office." She referred to Bandelier's own handwritten notes of the incident, which as most pertinent here stated only that grapefruit juice had, according to an unidentified source, been "ordered and tallied this weekend."[4] Bandelier wrote that she had "spoke[n] w/ [with] Carol [ plaintiff] & asked her to remind" two other workers, presumably, to watch for such errors. Bandelier also expressed the intention to "send email to all diet office staff." For purposes of summary judgment, plaintiff's averment that she had no involvement in any such error concludes the issue whether this was an instance of unsatisfactory performance. [5]

---

[4] According to plaintiff, "tallying" is a step in which a " 'tally clerk' would review all menus, input the appropriate information from the menus into the computer system, and place the orders with the kitchen to prepare the foods required for the next day's meals."

[5] Typical of defendant's approach on appeal is its complete disregard of plaintiff's controverting evidence while asserting as an established fact that "she made several significant menu errors, such as allowing grapefruit juice on a diet that forbade grapefruit." If defendant persuades a jury of this fact, the finding will be entitled to the presumption of correctness in any ensuing appeal. On appeal from summary judgment, however, defendant's assertions on this point are a legal nullity.

10

The e-mail also referred to a "coaching" on "consistent carb diets." Again the implication is that plaintiff was doing something wrong, though defendant makes no attempt to explain the entry. The sole explanation comes from plaintiff, who declared, "This alleged 'coaching' had nothing to do with any 'mistake' or 'patient safety incident' by me. Rather, it relates solely to Bandelier's objection to a long-standing Hospital policy . . . . On this day, I prepared a diabetic patient's menu according to the long-standing Hospital policy. . . . Bandelier took issue with how the diet staff (specifically me) prepared diabetic menus. When I explained to Bandelier that I had prepared the patient's menu in accordance with the Hospital's long-standing policy, she stated, 'Oh, I didn't know that. But you are still wrong.' I replied, 'Well, if I am wrong, then the whole diet office is wrong, because that is how I was trained by the dieticians.' Ms. Bandelier then stated that going forward we must insure that a diabetic patient is limited to 3-4 carbs per meal. I did not disagree with Ms Bandelier's change to the Diet Office's practice, and followed it consistently thereafter. . . ."

A trier of fact could reasonably find that other "coachings" were likewise unrelated to any breach of existing performance standards but were reflective instead of Bandelier's introduction of new practices. Thus Bandelier cited plaintiff's "fail[ure] to stamp menus with the name of a drug (Warfarin) that affected what foods were allowed on the patient's menu." But according to plaintiff, this reflected Bandelier's "instituting a new policy . . . that never existed before." Similarly, Bandelier's e-mail indicates that plaintiff had to be "coached" about "[m]iss[ing] . . . allergies 3 times (patient safety)." Again defendant chose not to favor the court with further explanation, apparently trusting the lack of detail to create a durable impression of deficient performance. But according to plaintiff this entry referred to her failure to stamp the word "allergy" on certain menus—a step for which there was, again, no existing requirement. Instead, she declared, the erstwhile practice was to address food allergies by specifying the foods the

11

patient was required to avoid; thus the office "had stamps for 'No Milk', 'No dairy products', 'No milk to drink' etc."

Other "coachings" could easily be viewed by a trier of fact as so trivial that their recordation was more suggestive of persecution than of anything resembling legitimate concern with performance. The entry about "soiled menus" might easily fall in this category. Two other entries in the e-mailed list consist of bare allusions to a "dirty work station." Again plaintiff's explanation for the entry stands uncontested: One incident occurred when "before I went to lunch I took a clean and unused mask from my pocket and placed it on my desk. . . . On the other occasion as I arrived to work I pulled my gloves out of my pocket and put them on my desk. I had not even sat down yet when Ms. Bandelier noticed my glove and told me to keep my area clean. Ms. Bandelier reminded us all to keep our work stations clean as they were shared by others. I followed her instructions and did not leave a dirty work station."

The last incident listed in Bandelier's memo occurred in July 2008 and is described only as "Lemon wedge on neutropenic diet." No attempt has been made to substantiate this incident, which plaintiff contends was entirely fabricated. She declared, "Ms. Bandelier approached me in the Diet Office and stated, 'I don't know what patient it is or what room number, but you allowed a lemon wedge on a patient's menu.'[6] I would

---

**6** The trial court erred when it sustained defendant's hearsay objection to this statement. The first test for hearsay is whether the extrajudicial statement is being *offered for the truth of the matter asserted*. (Evidence Code section 1200, subd. (a).) Here the matter asserted was that that plaintiff left a lemon wedge on a tray. Plaintiff obviously did not offer the evidence to prove this assertion, but rather as evidence that Bandelier had *falsely accused* her of the described conduct. A statement offered for such a purpose can never offend the rule against hearsay.

On appeal defendant does not defend the error induced by its meritless hearsay objection, contending instead that the lemon wedge accusation is a "red herring," and plaintiff's references to it "[i]nexplicabl[e]," because "Plaintiff received no discipline for

12

not have allowed a lemon wedge on such a diet and in fact when she stated she did not know who it was, I undertook to investigate the issue, found the only patient's room with that diet on the 6th floor and questioned the nurse . . . about the patient's tray.  The nurse stated the patient in question was no longer neutropenic.  <u>Ms. Bandelier never showed me the menu with the lemon wedge order, despite my request</u>."  Although defendant's hearsay objection to the penultimate sentence was properly sustained, plaintiff's declaration nonetheless supports an inference that she investigated Bandelier's accusation and was unable to find any factual basis for it.  That evidence tended to refute the accusation.

### 2.  "Two Patient Identifier" Violations

Several of the alleged performance deficiencies, including both of the written warnings preceding plaintiff's discharge, consisted of failures to strictly comply with the "two patient identifier" procedure introduced by Bandelier.  According to Bandelier, this procedure required menu clerks to mark restricted-diet menus with the patient's first and last name and date of birth so that the person delivering the meal could use that information to confirm the identity of the patient to whom it was delivered.  The date of birth was to be marked with a highlighter in order to flag the menu as a special one and to make the information easier to find.  Apparently this information was to be written not only once on a menu sheet but three times, i.e., next to each meal.  Plaintiff declared without contradiction that the policy only applied to patients with certain medically restricted diets, i.e., those with "dysphagi[a] [difficulty swallowing properly], bariatric stage I and II, food allergies and drug interaction."

Plaintiff conceded that in the first few months after the policy's adoption, she did not always strictly conform to it, sometimes failing in particular to enter a patient's first

the issue."  Bandelier herself cited this supposed incident in her memorandum, and by reference in her declaration, as evidence of deficient performance.

13

name or to mark the date of birth with a highlighter. However, she declared, "I have personal knowledge that other Diet Staff (diet clerks, menu clerks and tally clerks) had problems with and frequently failed to follow the 'two patient identifier' system as required by Ms. Bandelier." Bandelier acknowledged that plaintiff commented on the pervasiveness of these errors by other workers, but declared that she "repeatedly advised Ms. Cheal that if Diet Clerks or other employees made mistakes in their work, it was Ms. Cheal's responsibility to report those mistakes." How Bandelier responded to plaintiff's reports is somewhat beside the point, though a trier of fact might find an interesting discrepancy in the seeming fact that Bandelier hunted down plaintiff's errors on her own initiative, while leaving the errors of younger workers to be discovered and reported, if at all, by others. The more pertinent question is whether defendant established that plaintiff's infractions of the policy exceeded the hospital's norms—as established, for instance, by the rate and severity of errors committed by other workers. Defendant plainly failed to establish the absence of a triable issue of fact on this point. In addition to plaintiff's testimony—and Bandelier's acknowledgment of plaintiff's contemporaneous reports—a tally clerk testified that in her estimation, another menu clerk "made a lot of mistakes too"—probably more than plaintiff. There is no suggestion that the identified clerk received anything like the disciplinary attention Bandelier devoted to plaintiff.

A factfinder could also conclude that Bandelier substantially exaggerated the number and severity of plaintiff's violations of the two patient identifier policy—or at least that defendant failed to substantiate the number and severity claimed. Bandelier declared that on April 8, 2008, plaintiff committed violations "on six different menus." According to plaintiff, however, the first two menus were not subject to the two patient identifier procedure. The first involved a patient on a "Dental/Mech soft diet," which according to plaintiff, "is <u>not</u> considered a 'special diet.' " The second involved a

14

liquids-only diet which, according to plaintiff, required special handling obviating the two patient identifier entries required for the restricted diets subject to the protocol. Plaintiff concedes that on the third of the six menus, the two patient identifier information, though present, lacks highlighting on "one of the three menus," i.e., the space for one of the three meals listed on the page. In other words, the required information was presented—and properly highlighted—at two other points on the same page.

Plaintiff points out quite correctly that redactions on the next two menus render them incompetent or at best ambiguous with respect to the claimed errors. One of them bears an apparent sticky note with the handwritten legend, "No b-day [¶] No 1st name." However, on the copy in the record, what appears to be a rectangular redaction mark appears at or near two of the three places where a date of birth would apparently be entered. This supports an inference that the information was lacking, at most, from one of the three redundant locations. On the next menu a sticky note contains the legend, "Need 1st name," but since the names have been entirely obliterated it is impossible to tell whether the first name was missing from all three meals or only one meal. The last menu bears a sticky note saying "No b-date," and no obvious redactions where a birthdate might appear. But as to it, too, plaintiff observes with some justice that given defendant's redactions, it is impossible to verify Bandelier's characterization of the document.

In an attempt to fill this evidentiary vacuum, Bandelier declared that she had "reviewed the color copies of the menus in my file, which contain the unredacted patients' names and show the *absence of some highlighted birth dates* to confirm that these are the menus that correspond to this disciplinary action." (Italics added.) This proves at most that "some highlighted birth dates" were absent from one or more of the

15

six menus, or more precisely, from one or more of the 18 places where this information should have appeared.

In any event there is no suggestion that plaintiff failed to observe the two patient identifier protocol after June 8, 2008. The evidence thus supports an inference that, even if she was slower to adapt to the protocol than other employees—a premise defendant has failed to show is free of factual controversy—she had come into full compliance some four months before her discharge.

### 3. Wrong Liquids Incident

Plaintiff also raised a triable issue of fact whether the incident immediately preceding her discharge constituted an instance of deficient performance. The more-or-less undisputed facts concerning this incident appear to be these: A medical order was issued on Friday, September 5, 2008, restricting the patient in room 310A to "pudding thick" liquids. Plaintiff prepared the patient's menus that day and the next day, which covered meals on September 6 and 7. There is no competent evidence that either of these menus was in any manner deficient.

On Monday, September 8, a speech therapist apparently reported to Bandelier that she had observed "honey thick" liquids on the patient's tray, instead of the "pudding thick" liquids to which the patient was restricted. Assuming this reflected an error in the patient's menu, the menu would have been prepared the previous day by one Rebecca. Several hours after learning of the matter, and near the end of the shift, Bandelier went to the menu office, where plaintiff was still working on menus for the next day's meals. Bandelier found the menu for room 310A, and saw that it had been stamped "Thick Liquid (honey consist.)," with no notation of the "pudding thick" restriction. She showed the menu to plaintiff, along with the nutrition order restricting the patient to pudding thick liquids.

16

Apart from these facts, the parties' versions and interpretations of events diverge materially. First, a conflict exists with respect to what the speech therapist told Bandelier concerning the erroneous liquids she apparently observed. According to Bandelier, the therapist told her that the patient had been fed the wrong liquids "over the previous weekend" and that "the improper thickness of the liquid contributed to a fluid build-up in the patient's lungs and aggravated her medical condition."[7] The speech therapist, however, testified in deposition that while she might have told Bandelier the patient had "gunk in her lungs," that was a medical condition predating the dietary restriction and not something she attributed, or could have attributed, to any error in feeding.[8] Nor is there

---

[7] The trial court sustained a hearsay objection to these statements, but the only proper effect of that objection would be to prevent the admission of Bandelier's statements as proof of the matters supposedly reported by the speech therapist. Those statements remained admissible and highly relevant to support an inference that Bandelier did not accurately record or relate what she had actually been told.

[8] Defendant objected successfully to the speech therapist's deposition testimony on the ground that it was irrelevant—an assertion we emphatically reject. Bandelier's declaration recapitulates for nearly three pages her investigation of the original supposed error, and attaches and ratifies another 19 pages of contemporaneous documentation. These accounts include the repeated attribution of statements to the speech therapist to the effect that the patient had in fact been fed the wrong liquid, that this had gone on all weekend, that the patient had inhaled some of this material, and that medical complications had resulted. It is true that Bandelier then purported to disclaim any reliance on these materials, averring that "although it was important for me as a manager to understand what had happened with the patient over the weekend, I did not attribute any menu-related error by Ms. Cheal other than on September 8, 2008." But this disclaimer was disingenuous to say the least. On appeal defendant continues to assert as a fact that the patient "had been given 'honey-thick' fluids all weekend," and that this had "contributed to a fluid build-up in the patient's lungs," "aggravat[ing] her medical condition." A party cannot open the door to an issue in an effort to portray events in a particular light and then slam the door shut on his opponent merely by asserting that he does not really place any reliance on the matters thus introduced. Having suggested that plaintiff bore responsibility for a series of injurious errors, defendant could not exclude, on relevance grounds, controverting evidence. The trial court erred in allowing itself to be trifled with in this manner.

17

any evidence, other than Bandelier's account, that she told Bandelier the patient had actually ingested any improper food. She denied telling Bandelier anything about what the patient might have eaten over the weekend. According to Bandelier, the therapist told her that the nurse responsible for the patient had said "that the 'honey thick' liquids presented on the patient's tray on the morning of September 8th were the 'same as what the patient had been getting all weekend.' " But the nurse supposedly named by the therapist, when questioned, disclaimed any memory of the patient.[9]

In any event there was ample competent evidence that plaintiff committed no menu errors on the weekend of September 5-7. She declared without contradiction that she correctly prepared the patient's menu on September 5 and 6. On at least one of those days, a tally clerk recalled seeing a menu correctly marked by plaintiff with the legend "pudding thick." If an erroneous menu was prepared on September 7—affecting the meals served on September 8—it was prepared by Rebecca. Although defendant made some attempt to imply that plaintiff might bear some responsibility for the posited error by Rebecca, that suggestion was wholly ineffectual to sustain a summary judgment.[10]

---

[9] The nurse testified in deposition that according to his timecards, he had not worked in the wing including room 310A on the weekend of September 5-7. The trial court sustained objections to this testimony on the ground that it constituted improper secondary evidence of the contents of a writing. It is true that the witness seemed to be testifying more about the contents of the timecards than about his own knowledge and recollection of events. But with a proper foundation, the timecards themselves would presumably be admissible either as business records or as past recollection recorded. We do not believe a curable objection going merely to the form of evidence should be allowed to play a dispositive role in securing summary judgment. It benefits no one but the original defendant to dismiss a substantively meritorious action for damages only to generate a new action for legal malpractice.

[10] Bandelier declared that Rebecca had been trained by plaintiff, apparently implying that any errors by the former were attributable to the latter. Apart from the questionable logic on which this implication rests, plaintiff declared that she was responsible for only two of Rebecca's six days of relevant training. Bandelier also declared that when questioned about the September 7 menu, Rebecca said she did not

18

It follows that if any error was to be attributed to plaintiff with respect to room 310A—based on this record—it had to rest on the premise that plaintiff prepared an erroneous menu on Monday, September 8. As to that issue, plaintiff raised a triable issue by asserting that she had not yet finished with the menu when Bandelier intervened in its preparation. Plaintiff declared, "Because I had not yet completed my 'review' process of all menus, I had not yet written 'pudding' by the 'thick' stamp, which was my custom and practice. It is important to note that the Hospital does not have a 'pudding thick' stamp, so we use the 'honey thick' stamp cross[,] out honey[,] and write 'pudding' when appropriate. As my regular practice was to go over all menus before ending my shift, I had not yet completed my review and menu preparation. Thus, I had not had the opportunity yet to cross out the word 'honey' and hand write 'pudding' next to the thick stamp just as I did on this patient's menus for September 5 and 6."[11] (Emphasis omitted)

know how to prepare a "pudding thick" menu and that "if she had not known what to do, she would have copied the menu from the day before." This assertion on its face grounds two conflicting but equally likely inferences: that the September 6 menu was in error, or that the September 7 menu was *not* in error. Indeed there is no direct proof that *any* of the menus for room 310A contained an error; it is simply assumed that the menu prepared on September 7 was in error because the wrong food was, reportedly, delivered to the room on September 8. But Bandelier's own investigation pointed to several other potential causes for this mishap, including a "confusing" system of classifying thickness restrictions, and ignorance among at least some kitchen workers on the distinctions. Indeed Bandelier had originally "figured the kitchen staff made the error," but after investigating was "not so sure" because it appeared that many clinical-side workers were similarly confused or ignorant. At least two of them reported that they "did not know the correct way to modify a pudding thick diet order." At the same time, the hospital's own record-keeping system, or lack thereof, made it impossible to ascertain the cause of the supposed error. As Bandelier herself wrote, "I have no way of knowing if this patient's menu was or was not modified correctly before today. We have a paper system in the diet office—once the menu leaves, it's gone forever unless someone on the floor saves it and sends it back to the diet office." The menu most at issue in the supposed feeding error—the one prepared on September 7—was "long gone."

[11] If the distinction between "pudding thick" and "honey thick" was as critical to patient safety as defendant claims, it seems remarkable that defendant had not provided a

Bandelier went to great lengths at the time, and defendant goes to great lengths now, to discredit plaintiff's statements on this point. But it is not the office of summary judgment to weed out claims based on judges' doubts about the veracity of supporting evidence. We find nothing in the record rendering this testimony so intrinsically unworthy of belief that a trier of fact could not credit it.

If the menu was still awaiting final review, as plaintiff insists, then the features pounced upon by Bandelier had not ripened into an actual defect. A factfinder could so conclude. After all, so far as the record shows, plaintiff had properly prepared the same patient's menus on two prior days. If her testimony about her work procedures is believed—and as noted, we see no basis to hold that a factfinder could not believe it—then this was not an instance of deficient performance.[12]

### 4. Conceded Mistake

Plaintiff concedes making one serious error under Bandelier's supervision: On January 23, 2008—eight-plus months before her discharge—she wrote on a patient's menu that the patient was restricted to "semi-thin" liquids when in fact the patient had been restricted to thick liquids. Bandelier gave her an "oral counseling" reflected in a written memorandum placed in plaintiff's file. As discussed above, however, a trier of fact could conclude that under defendant's own written policies, the occasional commission of such errors fell within the norm of acceptable performance. Defendant

_____

"pudding thick" stamp to the menu office, thereby eliminating the workaround described by plaintiff, the hazards of which seem obvious.

[12] Bandelier made much of the fact, as defendant continues to do, that when confronted with the supposedly defective menu, plaintiff said, "I think I did it right last time." Defendant views this statement as an implied concession that the September 8 menu was in error. But according to plaintiff, she was merely pointing out to Bandelier, quite reasonably, that she had correctly prepared menus for the same patient on two previous days. The correct interpretation of plaintiff's words is obviously fraught with issues that only a trier of fact can resolve.

made no attempt to demonstrate that similar errors were not made by other, younger employees at similar or greater rates.

A factfinder could conclude that, apart from this one error eight months before her discharge, plaintiff exhibited no significant failures of competence while under Bandelier's supervision. Since she had up to that time always been found to have rendered satisfactory performance, a jury could find that Bandelier's list of supposed deficiencies had more to do with Bandelier's attitude toward plaintiff than with plaintiff's actual performance. Plaintiff presented ample evidence that her performance was in fact satisfactory, including defendant's own policies indicating that, at worst, she committed far fewer errors than might be anticipated, and deemed acceptable, in one performing her duties.

We therefore cannot accept the trial court's conclusion that "As Plaintiff made several mistakes on menus between January and May in 2008, Plaintiff fails to show she performed her job in a satisfactory manner." The record does not show "several errors" as a matter of law, and it does not show that some number of errors—even "several"— necessarily fell below the hospital's standards of performance.

We turn to the question whether the judgment can be sustained on another ground.

### III.   *Nondiscriminatory Reason vs. Discriminatory Animus*

#### A. *Introduction*

The trial court adopted a second rationale in support of summary judgment:  that (1) defendant "establishe[d] a legitimate, nondiscriminatory reason for its actions," and (2) plaintiff failed to "produce substantial evidence that Defendant's stated reasons were untrue or pretextual, or that Defendant acted with a discriminatory animus, such that a reasonable trier of fact could conclude that Defendant engaged in intentional discrimination or other unlawful action.  [Citation; record citations.]"  (Fn. omitted.) This was a reference to the second and third stages of the *McDonnell Douglas/Guz*

21

burden-shifting process:  If the plaintiff makes a prima facie showing—as we have found plaintiff could do here at trial—"the burden shifts to the employer to rebut the presumption by producing admissible evidence, sufficient to 'raise[] a genuine issue of fact' and to 'justify a judgment for the [employer],' that its action was taken for a legitimate, nondiscriminatory reason.  [Citations.]"  (*Guz*, *supra*, 24 Cal.4th at pp. 355-356.)  Legitimate reasons are those "that are *facially unrelated to prohibited bias*, and which, if true, would thus preclude a finding of discrimination.  [Citations.]"  (*Id.* at p. 358, fn. omitted.)  The employer's reasons "need not necessarily have been wise or correct," so long as they were not discriminatory.  (*Ibid*.)  Such a showing by the employer rebuts the presumption of unlawful discrimination, requiring the plaintiff-employee to come forward with evidence that the challenged treatment was in fact the product of an unlawful discriminatory motive.  (*Reid v. Google*, *supra*, 50 Cal.4th 512, 520, fn. 2.)

Here the reason defendant offered for plaintiff's discharge was the same one we have already examined:  that plaintiff was performing her job in an unsatisfactory manner.  As we have already concluded, the record presents triable issues of fact as to whether this was actually the case.  However, the question here is slightly different:  Not whether a nondiscriminatory ground for discharge existed in fact, but whether defendant discharged plaintiff on the basis of a genuine *belief* that such a justification existed.  As noted above, the relevance of a finding in defendant's favor is that it dispels the presumption of discrimination and requires plaintiff to come forward with additional evidence supporting an inference that her discharge was actually the result of unlawful discrimination.  That—and not "pretext"—is the fundamental question:  "The central issue is and should remain whether the evidence as a whole supports a reasoned inference that the challenged action was the product of discriminatory or retaliatory animus.  The employer's mere articulation of a legitimate reason for the action cannot answer this

22

question; it can only dispel the *presumption* of improper motive that would otherwise *entitle* the employee to a judgment in his favor. Thus, citing a legitimate reason for the challenged action will entitle the employer to summary judgment only when the employee's showing, while sufficient to invoke the presumption, is *too weak* to sustain a reasoned inference in the employee's favor." (*Mamou, supra,* 165 Cal.App.4th 686, 715; see *Reeves, supra,* 121 Cal.App.4th 95, 112, fn. 11 [criticizing cases in which "the 'pretext' tail wags the whole anti-discrimination dog"].)

### B. Confession of Bias

Here we think the many evidentiary conflicts and uncertainties about the litany of accusations lodged against plaintiff by Bandelier go far toward casting the legitimacy of the cited justification in doubt and supporting in its stead an inference of discriminatory animus. In addition, however, plaintiff presented another smoking gun in the declaration of Diana Hendry, a former friend of Bandelier's, who averred that Bandelier once confessed to her that she favored younger and pregnant workers, and that she was concerned about this treatment being noticed. According to Hendry, "One evening when I was at Ms. Bandelier's house for dinner, she said to me, 'We shouldn't have lunch anymore or talk socially at work . . . *People are starting to notice I'm favoring the younger and pregnant ones.*' " (Ellipsis in original, italics added.)

If this statement was admissible, it provided an ample basis for a finding that Bandelier's treatment of plaintiff had nothing to do with genuine deficiencies in plaintiff's work and everything to do with discriminatory animus against older workers. However the trial court sustained a hearsay objection to this averment, declaring it "double hearsay," in that it consists of "Hendry's recitation of what Bandelier told her for the truth of the out of court statements." This characterization is accurate as far as it goes; Hendry's declaration was itself hearsay, and Bandelier's statement to her was thus hearsay within hearsay. (See Evid. Code, § 1200, subd. (a).) The question is thus

23

whether each "layer" of hearsay is dispelled by a hearsay exception.  The first layer certainly is:  written declarations under penalty of perjury are admissible in motion practice despite their hearsay character.  (Code Civ. Proc., §§ 2009, 2015.5.)  Indeed the summary judgment statute explicitly contemplates reliance on declarations both in support of and opposition to the motion.  (Code Civ. Proc., § § 437c, subd. (b).)

The second layer—Bandelier's statements to Hendry—present a more genuine question.  Plaintiff characterizes them as "admissions" or "party admissions," citing Evidence Code section 1222, which codifies an exception for statements by a person authorized to speak for a party.  It is far from clear, however, that Bandelier could be found to have been authorized to state to a coworker that she was discriminating against a protected class of employees.  (See *O'Neill v. Novartis Consumer Health, Inc.* (2007) 147 Cal.App.4th 1388, 1403 [no error in exclusion of meeting minutes signed by Director of Regulatory Affairs, in absence of further evidence that he had authority to speak for company]; *Morgan v. Regents of University of Cal.* (2000) 88 Cal.App.4th 52, 70 [statements by human resources employees concerning futility of applications for rehire were not vicarious admissions where no evidence of authority in that "none of the individuals under discussion were involved in the decisions not to rehire appellant"]; cf. *O'Mary v. Mitsubishi Electronics America, Inc.* (1997) 59 Cal.App.4th 563, 570-574 [holding admissible vice president's statement to managers that director said company wanted to replace managers over 40].)

A more colorable ground for treating Bandelier's statements as vicarious admissions might be found in Evidence Code section 1224 (§ 1224), which makes admissible, against a party to litigation, statements by a person on whose breach of duty that party's liability may depend.[13]

---

[13] "When the liability, obligation, or duty of a party to a civil action is based in whole or in part upon the liability, obligation, or duty of the declarant, or when the claim or right asserted by a party to a civil action is barred or diminished by a breach of duty by

However, we need not determine whether Bandelier's reported statements to Hendry are admissible as authorized or vicarious admissions, for we have concluded that they were admissible as declarations against Bandelier's interest. Under Evidence Code section 1230 (§ 1230), evidence of an extrajudicial statement is admissible over a hearsay objection if "the statement, when made, was so far contrary to the declarant's pecuniary or proprietary interest, or so far subjected him to the risk of civil or criminal liability, . . . or created such a risk of making him an object of hatred, ridicule, or social disgrace in the community, that a reasonable man in his position would not have made the statement unless he believed it to be true." (§ 1230.)

A statement by Bandelier to a then-friend that she "favored" younger employees— and thus *dis*favored (discriminated against) older employees—was antithetical to her "pecuniary" interests in that, if publicly known, it would expose her employer to liability and jeopardize her own present and future employment. Although we have found no apposite California decision, a leading federal case held admissible, as a statement against interest, a worker's statement to fire investigators that he and some coworkers had entered their employer's premises after hours and had been smoking there not long before an early morning fire. (*Gichner v. Antonio Troiano Tile & Marble Co.* (D.C. Cir. 1969) 410 F.2d 238, 242 (*Gichner*), cited in House Comm. on Judiciary, Fed. Rules of Evid., H.R.Rep. No. 650, 93d Cong., 1st Sess., p. 16 (1973); 1974 U.S.Code Cong. & Ad.News 7075, 7089.) Judge Wright wrote that "[a] statement is against pecuniary and proprietary interest when it threatens the loss of employment, or reduces the chances for future employment, or entails possible civil liability." (*Id.* at p. 242.) The worker's "admission that he had been there after hours, for a purpose unrelated to his employment, and while

the declarant, evidence of a statement made by the declarant is as admissible against the party as it would be if offered against the declarant in an action involving that liability, obligation, duty, or breach of duty." (§ 1224.)

25

there did something which may have caused the destruction of his employer's stock in trade, reflects on his responsibility and trustworthiness, and can reasonably be said to jeopardize his standing with his employer." (*Ibid*.)

A supervisor's statement that she "favors" one class of employees, potentially at the expense of a protected class, creates a similar risk of future economic loss. The California Supreme Court has emphasized the career hazards faced by a discriminating supervisor as a justification for holding such persons immune from civil liability for such conduct. In *Reno v. Baird* (1998) 18 Cal.4th 640, 654-655, the court rejected a criticism that immunity would amount to a " 'free pass' " to the offending supervisor, stating, " 'An employer subjected to well-founded claims of employment discrimination as a result of an employee's intentional acts of discrimination is not likely to look favorably upon the offending employee. To the contrary, the employer, to protect its own interests and to avoid further liability, almost certainly will impose some form of discipline upon the offending employee. That discipline may include a 'free pass' to the unemployment line, a result that would seem particularly likely if the employee engages in repeated acts of intentional discrimination against fellow employees.' " (*Reno v. Baird* (1998) 18 Cal.4th 640, 654-655, quoting *Lenhardt v. Basic Institute of Technology, Inc.* (8th Cir. 1995) 55 F.3d 377, 381.) The court returned to this point in rejecting a parallel argument that its holding would reduce the effectiveness of the antidiscrimination statutes by allowing supervisors to "escape punishment" for discriminatory conduct: "Supervisors guilty of engaging in unlawful discrimination, and thus causing their employers to incur monetary liability, will often suffer demotion or unemployment. Their reputation with potential future employers will also be affected." (*Reno v. Baird*, *supra*, at p. 662.)

We think Bandelier's statement to Hendry sufficiently jeopardized her career prospects to be found against her pecuniary interests for purposes of a hearsay objection.

It may also be admissible as a declaration against *legal* interest, i.e., as exposing her to civil liability.

Remarkably, we have found no published California cases applying the "risk of civil . . . liability" branch of the exception in section 1230. There are many cases applying the exception for statements exposing the declarant to *criminal* liability, but they arise in the context of criminal prosecutions, and having reviewed a number of them we believe their holdings should be relied upon with caution in the civil context. They typically arise in one of two situations: either the prosecution seeks to introduce an absent declarant's statement that also incriminates the defendant, or the defendant seeks to introduce such a statement to show that a third party and not himself is the perpetrator of an offense. Both of these situations raise a number of complications not present in civil litigation. These include the privilege against self-incrimination; the right to confront adverse witnesses; the ease with which evidence of incriminating statements by absent declarants may be manufactured; the relative ineffectuality, in many criminal prosecutions, of the threat of a perjury prosecution as a deterrent to false testimony; and the potential for a miscarriage of justice if credible evidence of third-party culpability is categorically excluded. Considerations like these have led courts to require particularized indications of trustworthiness where an extrajudicial statement is offered as a declaration against penal interest. (See *People v. Duarte* (2000) 24 Cal.4th 603, 610-611.) These considerations are largely absent in the context of civil litigation.

With this caveat, however, we do find some guidance in those cases to the extent that they recognize that to come within the exception a statement need not wholly confess guilt; it need only be " 'distinctly against [the declarant's] interest.' " (*People v. Traylor* (1972) 23 Cal.App.3d 323, 331, quoting 5 Wigmore, Evidence (3d ed. 1940) § 1457, pp. 262-263.) Similarly, the court in *Gichner*, *supra*, 410 F.2d at page 242, found that the statement there sufficiently exposed the declarant to civil liability, notwithstanding that

27

the declarant "only stated that [he and his companions] had been smoking, not that they had been carelessly smoking." The court wrote, "[I]t is not necessary for the statement to include every aspect of negligence; it is enough if the statement could reasonably provide an important link in a chain of evidence which is a basis for civil liability . . . . In the circumstances of this case, the admission by Faulds that he had been smoking shortly before the fire does not seem so remote or tenuous that it was unlikely to entail his possible civil liability." (*Id*. at pp. 242-243, fn. omitted.)

Here a statement by Bandelier that she had been "favoring pregnant and younger [workers]" had a distinct tendency not only to jeopardize her career but to build a case against her personally for workplace harassment, and perhaps other torts. As already noted, she was immune from liability for engaging in most discriminatory employment practices. (*Reno v. Baird*, *supra*, 18 Cal.4th at p. 663; *Jones v. Lodge at Torrey Pines Partnership* (2008) 42 Cal.4th 1158, 1173.) But her immunity did not extend to claims of discriminatory *harassment*, for which the Legislature has unmistakably imposed personal liability on individual workers.[14] (Gov. Code, § 12940, subd. (j)(3).) A confession of discriminatory animus against older workers would be highly detrimental in defending a harassment claim. Nor was such a claim a remote possibility. In a letter to hospital administrators, plaintiff accused Bandelier of a "vendetta" against her, though without linking it explicitly to age discrimination.[15] A confession by Bandelier that she favored

---

[14] In doing so the Legislature overturned *Carrisales v. Department of Corrections* (1999) 21 Cal.4th 1132, 1134, 1140, which had extended immunity to nonsupervising coworkers for harassment under FEHA. This left only the question, which the court expressly left open, whether the cloak of immunity would also be cast over supervisory employees. (*Id.* at p. 1138, fn. 3.) Before the court had an occasion to reach that question, the Legislature intervened, declaring that *any* coworker may be liable for workplace harassment. (Gov. Code, § 12940, subd. (j)(3), enacted by Stats. 2000, ch. 1049, § 7.5, p. 7717.)

[15] The letter, sent on September 11, 2008, chronicled a number of instances of unfair and disparate treatment at Bandelier's hands. It referred to one exchange in which

younger workers would go far toward making out a cause of action against her personally.

We also note that Bandelier's statement to Hendry, if actually made, appears highly reliable. Certainly no one was in a better position than Bandelier to know whether she had been "favor[ing] younger and pregnant" employees. The utterance took place in a purely private, personal setting. No motive to fabricate has been suggested. Courts, including this one, have found a strong assurance of trustworthiness in the circumstance that a statement was made in a " 'conversation . . . between friends in a noncoercive setting that fosters uninhibited disclosures.' " (*People v. Tran* (2013) 215 Cal.App.4th 1207, 1217, quoting *People v. Greenberger* (1997) 58 Cal.App.4th 298, 335, and citing *People v. Cervantes* (2004) 118 Cal.App.4th 162, 174-175.) Further, the statement's evident purpose—so far as this record shows—was to enlist Hendry's cooperation in concealing Bandelier's favoritism. Such a motivation would seem to bolster the against-interest aspect by suggesting that Bandelier was conscious of the damaging potential her favoritism, if established, could have.

We conclude that for purposes of summary judgment, at least, the statement in question was admissible as a declaration against interest. To the extent the question involved any discretion, the trial court's implied determination to the contrary was an abuse of discretion. As we observed at the outset, in ruling on motions for summary judgment courts are to " 'liberally construe the evidence in support of the party opposing summary judgment and resolve doubts concerning the evidence in favor of that party.' " (*Conroy v. Regents of University of Cal.* (2009) 45 Cal.4th 1244, 1249-1250, quoting

Bandelier warned plaintiff that certain conduct of which she accused plaintiff could be considered harassment. Plaintiff wrote, "I said to Kim, 'you mean like you are doing to me now?' " In her declaration Bandelier denied that she was aware of plaintiff's specific complaints to management, but she acknowledged in deposition that she knew of a complaint through the union about "ongoing harassment in nutrition services."

*Yanowitz v. L'Oreal USA, Inc.* (2005) 36 Cal.4th 1028, 1037; see *Stationers Corp. v. Dun & Bradstreet, Inc.* (1965) 62 Cal.2d 412, 417 ["In examining the sufficiency of affidavits filed in connection with the motion, the affidavits of the moving party are strictly construed and those of his opponent liberally construed, and doubts as to the propriety of granting the motion should be resolved in favor of the party opposing the motion."].)

The order granting summary judgment rested entirely on two propositions: (1) Plaintiff had failed to raise a triable issue of fact with respect to whether she had performed her job competently; and (2) plaintiff had failed to raise a triable issue of fact in controversion of defendant's claim that she was fired for perceived performance problems and not as the result of discriminatory animus. We have concluded that neither of these premises can be sustained on this record.

**DISPOSITION**

The judgment is reversed.

30

_____

RUSHING, P.J.


WE CONCUR:




_____

ELIA, J.




_____

GROVER, J.






*Cheal v. El Camino Hospital*
**H036548**



31

Trial Court:                                    Santa Clara County Superior Court
                                                Superior Court No.:  CV141348


Trial Judge:                                    The Honorable
                                                Mark H. Pierce


Attorneys for Plaintiff and Appellant           Kastner Kim
Carol Cheal:                                     Eric C. Kastner
                                                J. Philip Martin


Attorneys for Defendant and Respondent          Fitzgerald Abbott & Beardsley,
El Camino Hospital:                             Sarah E. Robertson
                                                Mark A. Delgado


*Cheal v. El Camino Hospital*
**H036548**